**Norman L. JOHNSTON**

v.

**William J. LOVE, et al.**

**Civil Action No. 95–3727.**

United States District Court,
E.D. Pennsylvania.

July 22, 1996.

Norman L. Johnston, Huntingdon, PA, pro se.

Stuart Suss, District Attorney's Office, West Chester, PA, Walter S. Batty, U.S. Attorney's Office, Philadelphia, PA, for William J. Love, The Attorney General of State of Pennsylvania, The District Attorney of Chester County.

Walter S. Batty, U.S. Attorney's Office, Philadelphia, PA, for U.S.

## OPINION

LOUIS H. POLLAK, Senior District Judge.

Now before the court is a Report and Recommendation (R & R) by Magistrate Judge Rueter. The R & R recommends that this court deny a petition for habeas corpus filed by Norman L. Johnston, an inmate at the State Correctional Institution in Huntingdon, Pennsylvania. Mr. Johnston, who is proceeding *pro se*, has filed objections to the R & R. In lieu of filing a brief, the Commonwealth has filed a copy of the brief it has filed before the Third Circuit Court of Appeals in a related case, *David Johnston v. James Price*, No. 94–4314; the latter case is an appeal of the denial of the petition for habeas corpus of Norman Johnston's brother and codefendant, David K. Johnston.

### I. Background

I will begin with a brief recitation of the factual and procedural background of this case.[1] The evidence presented at Johnston's trial indicated that a group including Norman Johnston, his brothers David Johnston and Bruce Johnston, Sr., Richard Mitchell, Leslie Dale, Roy Myers, and James Griffen operated a burglary ring in Chester County, Pennsylvania. The group also included a number of members who were teenagers; these members were apparently referred to as the "Kiddie Gang."

1. A more detailed recitation appears in Judge Rueter's R & R.

In the summer of 1978, one of the members of the "Kiddie Gang," Bruce Johnston, Jr., began to cooperate with law enforcement authorities. He eventually testified before a federal grand jury investigation, which then subpoenaed other members of the "Kiddie Gang." In order to prevent their crimes from coming to light, the three Johnston brothers and Richard Mitchell apparently decided to kill the members of the "Kiddie Gang." In August 1978, they killed and buried three members of that group, James Johnston, Dwayne Lincoln, and Wayne Sampson. Thereafter, James Sampson, Wayne Sampson's older brother, who had become suspicious at his brother's disappearance, was also killed. (David and Norman Johnston were later charged with, and acquitted of, this murder; Bruce Johnston, Sr. was eventually found guilty of this crime.) With the assistance of Mitchell and Dale, David and Norman Johnston then attempted to murder Bruce Johnston, Jr. As a result of this incident, they injured Bruce Johnston, Jr., and killed his girlfriend, Robin Miller.

Law enforcement officials then arrested Dale, Mitchell, Griffen, and other gang members; all agreed to cooperate as witnesses for the Commonwealth. On January 29, 1979, David and Norman Johnston were each charged with five counts of murder and one count each of criminal conspiracy, attempted murder, aggravated assault, and a weapons offense. Bruce Johnston, Sr. was charged with the same crimes, and one additional count of murder. As a result of this additional charge, the trial of Bruce Johnston, Sr., was severed from (and followed) the trial of his brothers.

David and Norman Johnston were tried together before Judge Sugerman of the Chester County Court of Common Pleas. Their trial began on January 29, 1980; on March 18, they were found guilty of four of the counts of murder and all of the related charges. (As already noted, they were acquitted of the murder of Wayne Sampson.) Norman Johnston was sentenced to four consecutive life sentences and a further twelve and one-half to twenty-five years, to be served consecutive to the life sentences.

Norman Johnston appealed his conviction. Before the disposition of that appeal, he filed a motion seeking a new trial on the basis of after-discovered evidence. The Superior Court then remanded the case to Judge Sugerman for a hearing on this evidence. Judge Sugerman conducted that hearing on May 26 and 27 and June 10, 1987. On May 9, 1989, Judge Sugerman issued a lengthy (343–page) opinion finding that a new trial was not necessary. *See Commonwealth v. Norman L. Johnston,* No. 0037779, slip op. (Court of Common Pleas, Chester County, May 9, 1989) (hereinafter "Opinion of Judge Sugerman"). Johnston appealed this ruling; his appeal was consolidated with his original direct appeal, and, on May 31, 1990, both appeals were denied. On May 14, 1991, the Pennsylvania Supreme Court denied Johnston's petition for allowance of appeal. On June 14, 1995, Johnston filed the present petition for habeas corpus.

## II. Johnston's Petition

Johnston's habeas corpus petition, which is brought under 28 U.S.C. § 2254, asserts five claims:

(1) that he was denied his right to a fair trial because the Commonwealth failed to disclose a number of promises made to or benefits conferred upon James Griffen, a witness for the Commonwealth;

(2) that the trial court erred in excluding the testimony of Graham Andes, Esq., testimony which Johnston asserts would have called into question the credibility of Richard Mitchell, another witness for the Commonwealth;

(3) that the trial court erred in admitting into evidence information as to prior criminal activity by Mr. Johnston;

(4) that the trial judge was biased against him; and

(5) that his trial counsel was ineffective in a number of respects.

Johnston's petition was referred to Magistrate Judge Rueter. Judge Rueter prepared a 59–page R & R, to which Johnston has filed objections. Judge Rueter's R & R is learned and comprehensive, and reveals an intimate familiarity with the complex record in this case. I also note that Johnston's objections

demonstrate a very high quality of advocacy, especially given that he is appearing *pro se.* I will now consider the R & R, together with Johnston's objections.[2]

### A. *The Commonwealth's Failure to Disclose Promises To or Benefits Conferred Upon James Griffen*

James Griffen[3] was one of several important witnesses at the petitioner's trial who had at some point been confederates of the Johnstons. Griffen's testimony was that he had overheard the three Johnston brothers planning to bury "some snitches"—apparently referring to the victims of the triple murder—and that he had driven with Norman Johnston and others to the hardware store to buy shovels and lime for use in the burial. Griffen also testified that he had overheard Norman and David Johnston discussing the attack on Bruce Johnston, Jr. and Robin Miller, in terms that clearly implicated them. R & R at 19. Griffen was an important witness for the Commonwealth; indeed, Johnston points out that the Commonwealth's opening described a conversation to which Griffen was the only witness as the "crux" of the case, Tr., 2/8/80 at 109–110, and that the Commonwealth's closing emphasized Griffen's credibility as a witness. Tr., 3/14/80 at 5284.

The petitioner claims that Griffen received three benefits in exchange for his testimony, all of which should have been disclosed as exculpatory evidence under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). These were: (1) an alleged plea agreement under which the Commonwealth agreed to dismiss a pending criminal charge against Griffen and to charge him with no further crimes; (2) an informal use immunity agreement that Griffen concluded with the United States Attorney's Office that prevented the use of Griffen's testimony at the Johnston trial against Griffen in a later federal proceeding, and (3) the Commonwealth's release of Griffen on favorable bail conditions in exchange for his testimony. I will address them in that order.

■ 1. *Alleged Exchange of Leniency for Testimony.* Johnston claims that the Commonwealth had an arrangement with Griffen under which a pending charge of conspiracy to commit criminal homicide would be dropped. Johnston asserts that the alleged agreement also provided that no charges would be brought against Griffen for some 150 crimes, generally involving theft of property, to which Griffen confessed in pretrial interviews and at trial.

As Judge Rueter notes in his R & R, Judge Sugerman made a finding of fact that there was no such agreement, either as to the conspiracy charge or as to the additional charges. R & R at 23, 24, 26. By statute, this court is bound to defer to that finding unless it can be established that one of the

---

2. The Commonwealth has argued that Johnston's petition should be dismissed on the ground that Johnston had not properly presented some of his claims to the courts of Pennsylvania. Judge Rueter's R & R finds that Johnston has properly exhausted his state court remedies; the Commonwealth has not objected to this finding, and my review of it indicates that it is correct. I therefore will not discuss this issue further.

I also note that the recently-enacted "Antiterrorism and Effective Death Penalty Act of 1996," Pub.L. No. 104–132, 110 Stat. 1214 (1996), which was signed into law on April 24, 1996, changes the standards under which the federal courts are to review petitions for habeas corpus. Johnston's petition was, however, filed on June 14, 1995, well before this legislation was enacted, and I find that the Act is not intended to apply retroactively, at least not in the present circumstances. There is a "traditional presumption" against the retroactive application of nonprocedural statutes. *See Landgraf v. USI Film*

*Prods.,* 511 U.S. 244, ——, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994). The Act states explicitly that the provisions pertinent to death sentence cases are intended to apply to cases pending when the Act was enacted. *See* Pub.L. No. 104–132, § 107(c), 110 Stat. 1214, 1226 (1996). Otherwise, however, the Act contains no indication that its provisions are intended to apply to cases that are already pending. I therefore conclude that they are not so intended. *See United States v. Trevino,* No. 96–C–828, 1996 WL 252570 at *2 n. 1 (N.D.Ill. May 10, 1996) (concluding, for similar reasons, that the Act's provisions applicable to § 2255 cases are not intended to be retroactive); *Warner v. United States,* 926 F.Supp. 1387, 1390 n. 4 (E.D.Ark.1996) (same).

3. Griffen's name is spelled "Griffin" in a number of papers before this court. Judge Sugerman's opinion ruling on Johnston's motion for a new trial states that the witness's name is properly spelled "Griffen," Opinion of Judge Sugerman at 167, and I will follow that usage.

statutory exceptions applies. *See* 28 U.S.C. § 2254(d). Judge Rueter's R & R finds that Judge Sugerman's findings were adequately supported by the record, R & R at 24, 26; Johnston does not object to this finding.

Johnston's objections assert, however, that the legal standard applied by Judge Sugerman differs from the federal standard. Under the federal standard, as Johnston correctly observes, a bargain with a witness need not take the form of a formal promise or agreement; a bargain must be disclosed even if it is only an understanding or an informal assurance by the prosecution. *See Haber v. Wainwright,* 756 F.2d 1520, 1524 (11th Cir.1985) (finding that the prosecution is required to disclose the "advice" of a government attorney to a witness that the witness would not be prosecuted).

If Judge Sugerman applied a different legal standard, his factual findings would not be binding on this court. Judge Sugerman's findings are consistent, however, with the federal standard. His opinion states that "there was no arrangement of any kind—no promise, offer, plea bargain or otherwise—between the Commonwealth and the witness Griffen." Opinion of Judge Sugerman at 178. This language would appear to encompass both formal and informal agreements or assurances. Judge Sugerman's findings are adequately supported by the record; thus, I will defer to his finding that there was no agreement of any sort under which the Commonwealth would either drop charges pending against Griffen or abstain from bringing any new charges.[4]

2. *Federal Use Immunity Agreement.* The second *Brady* issue raised by Johnston is the prosecution's failure to disclose to him the fact that Griffen was the beneficiary of a federal use immunity agreement.[5] This agreement was concluded in 1979 between Griffen and federal officials (under the leadership of Assistant U.S. Attorney Douglas Richardson), apparently in anticipation of Griffen's testimony at the federal trial of one Thomas Rebert. (Although the record does not identify Rebert with precision, it appears that his prosecution was related to theft and transportation of stolen goods by the Johnstons and their associates, but not to the murder charges.[6]) The immunity agreement was not limited to testimony at that trial, however; it encompassed testimony relating to a total of nineteen persons—including Norman Johnston—and specifically mentioned testimony relating to the murder of federal witnesses. The agreement provided that no testimony provided by Griffen would be used "directly or indirectly against him in any federal prosecution." The agreement also stated, however, that it "was not intended to, and does not, in any way influence or limit the prosecutive [sic] discretion of any state or local authority." Exhibit P–8 to Plaintiff's Petition for Habeas Corpus.[7]

Had the state prosecutors known of this agreement, they would have been obligated to disclose its existence to Johnston under

---

4. Johnston's objections also argue, based on dicta in *Ouimette v. Moran,* 942 F.2d 1, 7 (1st Cir.1991), that Griffen's presence in the federal witness protection program indicates that some assurances existed as to pending charges against him. In a memorandum dated May 13, 1996, this court rejected that claim.

5. Technically, the agreement was not a formal use immunity agreement, but a memorandum of understanding. Testimony of Douglas Richardson, 6/10/87, at 98. The distinction is not an important one for our purposes here.

6. The first subject of testimony listed in the immunity agreement with Griffen is "the theft, interstate transportation, and illegal resale of tractors and accessories for those tractors." Exh. P–8 to Petition for Habeas Corpus. AUSA Richardson testified at the evidentiary hearing before Judge Sugerman that Griffen's request for immunity may have been motivated by a concern on Griffen's part that his testimony would be used to prosecute him for interstate transportation of stolen property, Tr., 6/10/87, at 99–100, suggesting that this was the subject of the Rebert prosecution.

7. There were in fact two versions of the immunity agreement with Griffen, the one quoted in the text, and a second, undated, document. The latter document has some differences of wording from that quoted in the text. For instance, it does not state explicitly that it does not apply to state prosecutions (although it does refer only to federal use immunity). There appear to be no substantive differences between the two documents, however. Richardson testified that he could not explain why there were two agreements, but that both accurately reflect the agreement with Griffen. Tr., 6/10/87, at 104–05.

*Brady.* The agreement prevented Griffen's testimony from being used against him in a federal prosecution, and hence had some impeachment value. *See United States v. Pflaumer,* 774 F.2d 1224, 1226 (3rd Cir.1985). At the state-court hearing on Johnston's motion for a new trial, Judge Sugerman found that the Commonwealth's prosecutorial team was not in fact aware of this agreement. Opinion of Judge Sugerman at 205. Johnston has not contested this finding.

Johnston has, however, argued that the Commonwealth had constructive knowledge of the existence of this agreement. In *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Court found that, for purposes of establishing a *Brady* violation, government officials who did not have actual knowledge of certain information can nevertheless be deemed to have had constructive knowledge of it in some circumstances. *See id.* at 154, 92 S.Ct. at 766. In *Giglio,* a witness had been told by an Assistant U.S. Attorney that he would be given immunity in exchange for his testimony; the prosecution was then conducted by a different member of the same office, who was not aware of this promise, and who therefore did not disclose it to the defense. The *Giglio* court found, citing agency principles, that "[t]he prosecutor's office is an entity" and that "[a] promise made by one attorney must be attributed, for these purposes, to the Government." *See Giglio,* 405 U.S. at 154, 92 S.Ct. at 766. *Giglio's* constructive-knowledge rule has been applied to situations in which the prosecutorial team included both federal and state officials. *See United States v. Antone,* 603 F.2d 566, 569 (5th Cir.1979) (finding that knowledge of a state official functioning as part of a joint federal-state

investigation could be imputed to federal officials). The Third Circuit has specifically approved *Antone's* holding. *See United States v. Perdomo,* 929 F.2d 967, 970 (3rd Cir. 1991).[8]

In order to apply *Giglio's* agency-law methodology, it is necessary to identify the relevant entity within which officials are deemed to have constructive knowledge of information known to one another. In *Giglio,* the relevant entity was apparently the federal prosecutorial team. In *Antone,* it was the federal investigative and prosecutorial team, of which a state official was acting as an agent. *See* 603 F.2d at 570. If the relevant entity in the present case is thought to be the state prosecutorial team, then *Giglio* would not appear dispositive, as it seems clear that federal officials were not acting as agents of the state prosecutorial team in negotiating the immunity agreement.[9]

In some circumstances, however, it seems that a court, in applying *Giglio,* must impute knowledge within a hybrid entity that is not, strictly speaking, either a state or a federal prosecutorial team. *Antone* emphasized that in cases in which federal and state investigations overlap, and the two groups of officials "have cooperated intimately from the outset of an investigation," the courts must conduct a "case-by-case analysis of the extent of interaction and cooperation between the two governments." 603 F.2d at 570. To assume that a prosecutorial undertaking is always within the exclusive control of either state or federal officials would ignore the practical reality of federal-state cooperation. At times, federal and state officials may cooperate closely enough to be functionally a single unit, but divide their responsibilities in such a way that each assumes the lead on certain

**8.** To this court's knowledge, this rule has only been applied in situations in which knowledge of information in the possession of state officials is imputed to federal officials. In the present case, the situation is the reverse. There would seem, however, to be no reason to distinguish between these two situations.

In discussing the constructive-knowledge issue the Third Circuit has characterized the pertinent inquiry as whether it is reasonable for the prosecution to have been unaware of undisclosed information. *See U.S. v. Joseph,* 996 F.2d 36, 40 (3rd Cir.1993). This is essentially equivalent to

*Giglio's* agency inquiry, in the sense that it is unreasonable for a prosecution team to be structured in such a way that important information available to one agent of that team is not transmitted to another agent of the same team. Indeed, the Court suggested in *Giglio* that "procedures and regulations can be established" to ensure that all relevant information is properly communicated to all attorneys who should be aware of it. 405 U.S. at 154, 92 S.Ct. at 766.

**9.** Judge Rueter's R & R comes to this conclusion, R & R at 38–39, and I agree.

matters, so that neither group controls the entire effort.

In the present case, Judge Rueter's R & R finds, and I agree, that the record supports the conclusion that "there was a joint federal-state effort to investigate and prosecute the Johnston gang for the murders." R & R at 33 n. 12. This joint effort can be characterized either (1) as a joint effort to prosecute the Johnstons and their associates for murder, or (2) as a joint effort to prosecute the Johnstons for *all* of their criminal activities. Under the first characterization, imputation of knowledge would not be appropriate. As I have already observed, the immunity agreement was concluded in contemplation of the Rebert prosecution, a prosecution which apparently was related to the Johnstons' alleged theft and transportation of stolen goods, but not to the murder charges.[10] Under the first characterization of the joint federal-state effort, then, federal officials would not have been acting as agents of that effort when they concluded an immunity agreement with Griffen.[11]

Turning to the second characterization of the joint federal-state effort—as having been directed at all of the criminal activities of the Johnstons and their associates—I will now consider whether there existed such an effort, and whether this effort was sufficiently closely integrated to permit imputation of knowledge under *Giglio* and *Antone*. There is some evidence that there was close federal-state cooperation in this area. Federal and state officials apparently had an agree-ment to share information related to the Johnston cases. *See* Testimony of David Richter, 6/10/87, at 130. This agreement appears not to have been limited to the murder prosecutions. Indeed, at the evidentiary hearing before Judge Sugerman, AUSA Richardson (who had an important role in the federal component of the Johnston investigation) expressed some surprise that the state prosecutors were unaware of the immunity deal with Griffen, because of the nature of the information flow between federal and state officials. *See* Tr., 6/10/87, at 109. Richardson also testified that he did not recall formally notifying state officials of the existence of the immunity agreement, and stated that this was presumably because his "thinking at the time" was that "the instrument related to federal prosecution, and did not purport to bind or to limit state prosecutions." *See id.* at 106–07.

It is also noteworthy that federal officials apparently considered it appropriate to meet with their state counterparts to discuss their intention to grant immunity to Griffen, even though the immunity was to be granted in anticipation of a prosecution unrelated to the murder charges. At that meeting, which apparently occurred in mid–1979, Assistant District Attorney Dolores Troiani, a member of the Chester County team that prosecuted the Johnstons, specifically objected to any immunity arrangement that encompassed the murder charges. *See* Tr., 5/27/87, at 115. Federal officials assured Troiani that no such immunity deal would be struck. *See id.* at 119.[12] The fact that federal officials consult-

---

**10.** The immunity agreement did include references to the Johnstons and to the murder of federal witnesses. However, AUSA Richardson, the federal official responsible for negotiating the agreement with Griffen, testified at the evidentiary hearing before Judge Sugerman that the inclusion of this material did not stem from anticipation of the Johnstons' murder prosecutions. Instead, he stated, "the focus of this particular document was the case that was coming up soonest, which was the Rebert case. As I recall drafting that, putting in a voluminous laundry list of names, part of which was to suggest to Mr. Griffen and to his counsel how broad our information was about the operations of all the things which he had knowledge." Evidentiary Hearing, 6/10/87, at 100–01. Rebert was not a witness at Johnston's trial, further suggesting that the two prosecutions had a different focus.

**11.** If federal officials acted as agents of the joint federal-state undertaking for some purposes, but acquired exculpatory information while acting in a different capacity, this would not be enough to find that the state prosecutors had constructive knowledge of that exculpatory information. *See U.S. v. Joseph*, 996 F.2d 36, 40 (3rd Cir.1993) (finding that a prosecutor was not required to disclose exculpatory information that became available to him in his capacity as prosecutor in an unrelated investigation if he was neither aware of that information nor specifically asked to search for it).

**12.** Johnston asserts in his objections that the evidence only indicates that Troiani objected to federal prosecutors granting Griffen immunity from *state* prosecution, and that she therefore should have been on notice that Griffen might

ed with their state counterparts, and expressed a willingness to defer to their wishes, suggests that there was some cooperation between federal and state officials on the investigation as a whole.[13]

Because there appears to have been little inquiry into these topics in the state proceedings, there is little other material in the record addressing the nature of the federal-state relationship. However, the investigation into the activities of the Johnstons and their associates involved at least nineteen defendants (the number listed in the federal immunity agreement) and a wide range of types of crimes, from interstate transportation of stolen goods to narcotics distribution. Although it seems possible that federal and state officials could have cooperated closely throughout such a large and diverse investigation, it is unlikely. Moreover, the principal target of the Rebert prosecution appears to have been interstate transportation of stolen goods. Although a county district attorney's office could be expected to have an interest in this subject, that interest would seem unlikely to rise to the level of full-fledged partnership.

It therefore seems improbable that the appropriate unit of analysis for purposes of *Giglio* is the joint federal-state investigation into all of the criminal activities of the Johnstons and their associates. Nevertheless, I find that the present record does not permit me completely to foreclose this possibility. Thus, I will proceed to consider the likelihood that the defense's ignorance of the fed-

eral use immunity agreement would have changed the result of Johnston's trial. Because the Supreme Court has found that such an analysis must consider the impact of undisclosed evidence "collectively, not item-by-item," *Kyles v. Whitley*, —— U.S. ——, ——, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995), I will defer this analysis until I have considered the circumstances of the Commonwealth's release of Griffen on bail.

3. *Conditions of Griffen's Release on Bail.* Before his cooperation with the authorities began, Griffen was arrested and held in prison in Florida as a result of burglary charges pending against him in Pike County, Pennsylvania. While Griffen was in prison in Florida, the Chester County District Attorney's Office filed a complaint charging him with conspiracy to commit criminal homicide (a complaint based on Griffen's involvement in the murders for which the Johnstons were eventually prosecuted). Griffen was then transferred to Pennsylvania, first to the Chester County Prison, and then to the Lancaster County Prison; his bail was set at $50,000. In April, 1979, the Commonwealth filed a motion to reduce Griffen's bail to $1.00, and Griffen was released. As a condition of his release, Griffen was required to live in lodging designated or approved by the District Attorney's Office, to work at a job designated or approved by that office, and to report to local officials a total of three times a week. He was also barred from telling anyone of his new location, speaking about his involvement in the Johnston cases, meeting with friends or relatives without prior

---

have been granted *federal* immunity. The record does not support this conclusion. Troiani's testimony is that she was presented with a draft immunity agreement that could have been read to confer immunity as to both federal and state prosecution. She objected to this agreement, and was told "that the homicides were more important than any prosecution the federal authorities had, and they would never do anything which would in any way interfere with our prosecution, and if I had an objection to that, then they wouldn't proceed with it." Tr., 5/27/87 at 118–19.

The statement that there would be no interference with the state prosecution can be read either (1) as an assurance that Griffen would not be granted use immunity for purposes of a state murder prosecution, or (2) as an assurance that Griffen would not be accorded any immunity that might diminish his credibility as a witness at

the Johnston trials. The second seems the more appropriate reading, given state officials' apparent emphasis on the Johnston prosecutions. In either case, it would have been reasonable for Troiani to conclude from the statement that federal officials "would not proceed with" the agreement that no immunity agreement was to be concluded at all.

13. On the other hand, federal officials ultimately did conclude a federal immunity agreement, and apparently never communicated its existence to state officials. To give this fact too much weight would, however, be a species of circular reasoning, as it would amount to finding that, because state officials did not know of the agreement, it would be inappropriate to impute knowledge of that agreement to them.

approval, making any collect calls, or corresponding with anyone except through local officials. Griffen was also provided with $300 for his living expenses. R & R at 27–28.

Johnston asserts that the reduction of bail was a *quid pro quo* for Griffen's agreement to testify, and that this *quid pro quo* should have been disclosed. Judge Rueter's R & R finds that, on the contrary, Griffen's release was intended to protect Griffen. Griffen had apparently been receiving threats from the Johnston brothers. Although the Johnstons were in a different prison, state officials seem to have believed that Griffen's life might still be in danger, especially because it was thought that the Johnstons had killed other witnesses. Testimony of Dolores Troiani, 5/27/87, at 135–37. Judge Rueter's R & R finds, and I agree, that Griffen's release was not a *quid pro quo* for testimony.

Judge Rueter does, however, conclude that Griffen's release from incarceration at the request of the Commonwealth and his receipt of $300 should have been disclosed to Johnston's defense as potential impeachment material. R & R at 28–29; *see also U.S. v. Thornton,* 1 F.3d 149, 158 (3rd Cir.1993) (holding that the government was required to disclose payments made to prosecution witnesses). I agree with Judge Rueter's findings, and would add that the general terms of Griffen's release on bail—for instance, the fact that the release agreement suggested that state officials might supply Griffen with housing and a job—should also have been disclosed to the defense.

■ I will now consider whether disclosure to Johnston's counsel of the terms of Griffen's release on bail or of Griffen's use immunity agreement with federal officials could have changed the outcome of Johnston's trial. Failure to disclose exculpatory evidence only rises to the level of constitutional error "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles,* —— U.S. at ——, 115 S.Ct. at 1565 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)). As already noted, *Kyles* requires that this analysis consider the impact of undisclosed evidence "collectively, not item-by-item." —— U.S. at ——, 115 S.Ct. at 1567.

The undisclosed evidence at issue in this case, although somewhat troubling, is not of such a character as to create a reasonable probability that, had it been disclosed, the result of Johnston's trial would have been different. Both items of undisclosed evidence would have been of fairly small value in impeaching Griffen's testimony. To begin with the conditions of Griffen's release on bail, I agree with Judge Rueter's finding that Griffen was released for his own protection, and that the conditions of his release were essentially analogous to those imposed on participants in the federal witness protection program. (Indeed, state officials attempted to place Griffen in that program, and later succeeded in securing such a placement.) R & R at 28–31. Johnston's counsel presumably could not have used the circumstances of Griffen's release on bail to impeach Griffen as a witness without revealing that Griffen was released to protect him from being killed by the Johnston brothers. *See United States v. Adams,* 785 F.2d 917, 921 (11th Cir.), *cert. denied,* 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 706 (1986). As Judge Rueter observes, the defense knew that Griffen was in the federal witness protection program when he testified, but chose not to cross-examine him about that fact. R & R at 31.

Turning to the federal use immunity agreement, and assuming *arguendo* that knowledge of this agreement can be imputed to state officials, I find that this agreement would also have been of relatively small impeachment value. Use immunity only impedes, and does not preclude, a subsequent prosecution. Thus, it has less impeachment value than do more direct benefits that the prosecution may confer upon a witness, such as promises of leniency. *See United States v. Pflaumer,* 774 F.2d 1224, 1230 (3rd Cir. 1985). Moreover, this particular immunity agreement did not give Griffen any protection from the use of his testimony in a state-court prosecution. The agreement would still have been of some use in impeaching Griffen's testimony, both because it protected Griffen from the use of his testimony in a federal prosecution, and because it might

have indicated to the jury that Griffen was, generally speaking, allied with the prosecution.

I note, however, that the defense was already able to argue to the jury that Griffen was an ally of the prosecution. The defense established that Griffen had admitted to about a hundred and twenty-five thefts for which he had never been charged. Testimony of James Griffen, 2/18/80, at 1554–56. In his closing, Johnston's attorney observed that Griffen had not been charged for these thefts after almost two years, and asserted that Griffen must have thought to himself as he testified: "I better help the Commonwealth or I'm going to go away for a long time." Transcript, 3/13/1980, at 5162–63. Thus, although the federal immunity agreement represented an additional increment of impeachment evidence, its marginal value would not have been large. Judge Rueter also observes that the Commonwealth presented many other witnesses, whose testimony was quite incriminating. R & R at 30. I therefore conclude that there is not a reasonable probability that the small margin of impeachment provided by the federal use immunity agreement would have altered the result of the petitioner's trial.

## B. *Testimony of Graham Andes*

The second basis for relief asserted in Johnston's petition for habeas corpus is that the trial court erred in excluding the testimony of Graham Andes, testimony which Johnston asserts would have called into question the credibility of Richard Mitchell, a witness for the Commonwealth. At the petitioner's trial, Mitchell testified that he had witnessed the petitioner's murder of James Sampson. Mitchell also testified that he had overheard conversations in which Norman and David Johnston discussed the attack on Bruce Johnston, Jr. and Robin Miller.

Johnston asserts that Andes had been Mitchell's lawyer in 1975, and that Andes would have testified that Mitchell, seeking favorable treatment from the authorities, had

told Andes that Bruce and Norman Johnston had told Mitchell that they had killed a person named Kenny Howell. Mr. Howell, it later emerged, was alive at the time that Mitchell's statement was made. Johnston asserts that Andes' testimony would have demonstrated that Mitchell had a general practice of testifying falsely that the Johnston brothers had committed murder in order to secure favorable treatment for himself.

■ Judge Sugerman excluded this evidence; Johnston argues that this ruling was incorrect. I will not address that question, however, because I agree with Judge Rueter's conclusion that, even supposing that Judge Sugerman's ruling was erroneous, Johnston cannot demonstrate that it infringed his constitutional rights. Andes' testimony was of limited value in impeaching Mitchell's credibility, because it was susceptible to at least two interpretations: that Mitchell had lied about the Johnstons' discussion of Howell, and that it was the Johnstons who had lied, and that Mitchell's report of what he had heard was correct.[14] As Judge Rueter observes, a mistaken evidentiary ruling will only rise to the level of constitutional error if that ruling is arbitrary. *Washington v. Texas*, 388 U.S. 14, 16–17, 87 S.Ct. 1920, 1921–22, 18 L.Ed.2d 1019 (1967). I do not find that Judge Sugerman's ruling was arbitrary, given the ambiguous nature of Andes' testimony and the fact that it was to be introduced on the collateral question of Mitchell's credibility.

## C. *Norman Johnston's Prior Bad Acts*

Johnston asserts that Judge Sugerman's rulings admitting considerable evidence of Johnston's past criminal activity were arbitrary and deprived him of his right to a fair trial. There was a considerable amount of evidence of Johnston's past criminal activity admitted at his trial. This included, *inter alia*, evidence that Johnston had fled following his indictment by a federal grand jury for obstruction of justice, evidence that he had

---

**14.** Johnston points out in his objections that Andes would have testified that Mitchell had offered to take the authorities to Howell's gravesite. Tr., 2/29/80, at 3692–93. It is possible, however, that Mitchell merely intended to act on the basis of information that he had received from the Johnstons, and that he did not claim to know the location of the site firsthand.

repeatedly sold stolen goods to two persons who testified as to those transactions, and evidence that Johnston had discussed escaping from prison with a fellow inmate.

■ Judge Rueter's R & R finds that this evidence was all properly admitted, R & R at 46, and I agree. The theory of the prosecution was that Johnston and his brother committed the murders with which they were charged in order to prevent a federal investigation from revealing the thefts in which they had been involved. It was therefore appropriate for the prosecution to introduce evidence that Johnston had sold stolen goods, as this demonstrated the extent of the crimes that Johnston wished to conceal. Judge Sugerman also gave a cautionary instruction to the jury directing them not to convict Johnston of uncharged conduct. R & R at 46.

■ The federal obstruction of justice charge related to Johnston's alleged intimidation of witnesses associated with the federal investigation; Johnston's flight from that charge would therefore demonstrate consciousness of guilt of the underlying crime. *See United States v. Bamberger,* 456 F.2d 1119, 1126 (3rd Cir.1972), *cert. denied,* 413 U.S. 919, 93 S.Ct. 3067, 37 L.Ed.2d 1040 (1973). Finally, the evidence that Johnston had considered escaping from prison before his trial was admissible as evidence of his consciousness of guilt of the underlying charges.

### D. *Bias of the Trial Judge*

■ One of the Commonwealth's witnesses was Richard Falasco, a prison inmate. Falasco testified that Johnston's attorney, Lawrence Goldberg, had been present (although not necessarily within earshot) when Goldberg's assistant had sought to induce Falasco to testify falsely. According to Goldberg's testimony at a 1982 post-trial evidentiary proceeding before Judge Sugerman, Judge Sugerman stared at Goldberg during Falasco's testimony for ten to fifteen seconds with his glasses lowered and a look of "astonishment" on his face. Testimony of Lawrence Goldberg, 7/7/82, at 6–7. Johnston contends that the judge's stare discomfited Goldberg and suggested to the jury that the judge believed that Goldberg had misbe-

haved, and so prejudiced Johnston's right to a fair trial. Judge Rueter's R & R finds that Judge Sugerman's stare was not sufficiently indicative of bias to violate the petitioner's due process rights. I agree with this finding, and adopt Judge Rueter's reasoning on this point.

### E. *Ineffectiveness of Trial Counsel*

Johnston makes five claims of ineffective assistance of counsel. In order to establish that his counsel was ineffective, Johnston must show (1) that his attorney's representation "fell below an objective standard of reasonableness," *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. at 2068.

■ 1. *Failure to Seek Mistrial.* Johnston's first claim of ineffective assistance of counsel is based upon the failure of his attorney, Lawrence Goldberg, to seek a mistrial or a cautionary instruction after the incident, described above, in which Judge Sugerman stared at his attorney. I agree with and adopt Judge Rueter's analysis of this claim. *See* R & R at 50–52. In particular, I do not find that there is a reasonable probability that a request for a mistrial would have been granted, or that, had Judge Sugerman delivered a cautionary instruction, the result of the proceeding would have been different.

■ 2. *Failure to Seek Permission to Testify.* Johnston's second claim, based upon the same incident, is that Goldberg should have sought permission to testify in order to rebut Falasco's charges that Goldberg had been involved in an attempt to induce Falasco to commit perjury. Judge Rueter notes: (1) that Falasco had not directly accused Goldberg of involvement, reducing the need for Goldberg to testify, and (2) that Goldberg had consulted with counsel for Johnston's codefendant, and that the two agreed that Goldberg's testimony would only remind the jury of the incident. Judge Rueter therefore finds that Goldberg's decision was reasonable. R & R at 52–53. I agree.

■ 3. *Failure to Object to Mitchell's Testimony that Johnston Had Put a Contract on Mitchell's Life.* Johnston's third claim is that Goldberg should have objected to Mitchell's testimony that Johnston had a "contract" on Mitchell's life. I concur with Judge Rueter's finding that such an objection would have in all likelihood been futile. In his cross-examination of Mitchell, Goldberg had sought to show that there was evidence that Mitchell had committed the murders himself, Tr., 2/13/80, at 769–07, and invited the jury to conclude that Mitchell had made a bargain with the Commonwealth in exchange for his testimony. Tr., 2/13/80, at 761–64. It was appropriate for the Commonwealth to respond to this line of questioning by seeking to show that Mitchell's motive for testifying was instead that one or both of the two defendants had placed a contract on Mitchell's life. *See* R & R at 53–54. Goldberg's decision not to object was therefore not unreasonable.

■ 4. *Failure to Object to Mitchell's Testimony that Johnston Had Been Involved in Other Murders.* Johnston's fourth claim is that Goldberg should have objected to Mitchell's testimony that David Johnston had said, in the course of a conversation with Norman Johnston and Bruce Johnston about the disposal of the body of James Sampson, that if Sampson's body were put in the landfill "it would not be found like the other guys that were put in the landfill." R & R at 55. Although this testimony related only to comments by David Johnston, it could have suggested to the jury that the Johnston brothers, as a group, had been responsible for other murders. Thus, the testimony was harmful to Norman Johnston.

Goldberg himself explained his failure to object to Mitchell's testimony as being part of a strategy of impeaching Mitchell by attempting to show that his testimony was inconsistent. The defense anticipated that Mitchell would be confused as to how many bodies were in the landfill and in another burial site, and saw Mitchell's landfill testimony as "another example of Mitchell being inconsistent." Tr., 7/7/82 at 27. Both

Goldberg and John Lachall (who was David Johnston's attorney) devoted a considerable effort in their closing arguments to attacking Mitchell's credibility, specifically on the ground that Mitchell was confused about events and therefore unreliable. Tr., 3/13/80, at 5128–41, 5198, 5221–25. Judge Sugerman, in an opinion ruling on a post-trial motion by Johnston for a new trial, found that attacking Mitchell as unreliable had indeed been Goldberg's strategy, Opinion of Judge Sugerman at 225–35, and that finding is binding on this court. *See* 28 U.S.C. § 2254(d); *see also Flamer v. State of Delaware,* 68 F.3d 736, 756 (3rd Cir.1995) (similarly treating a state-court finding as to the nature of counsel's trial strategy as binding).

Certainly, this represented a risky choice of trial strategy. In adopting it, Goldberg was hoping that the jury would view Mitchell's testimony as evidence of Mitchell's own confusion, rather than as evidence of his client's involvement in other, uncharged murders. However, under *Strickland,* "counsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment," and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690, 104 S.Ct. at 2066. There is no indication that any further investigation of either law or facts would have affected Goldberg's assessment of his trial strategy. Thus, this court, must determine whether Goldberg's strategic choice was so unreasonable as to meet *Strickland*'s high standard for challenges to counsel's strategic decisions. Although Goldberg's strategic choice was a risky one, it cannot be said to be so unwise as to meet that standard.

■ 5. *Failure to Object to Commonwealth's Closing Argument.* Johnston's fifth and final claim of ineffective assistance of counsel is that his counsel was ineffective because he failed either to object during the Commonwealth's closing argument or to request a curative instruction.[15] Johnston cites

---

15. Judge Rueter's R & R analyzes these claims as though petitioner were claiming that the Com-

monwealth's closing had violated his due process rights directly. R & R at 56. That due process

seven instances in which he believes an objection would have been appropriate. As to four of these statements, an objection would very likely not have been sustained, so that Goldberg's failure to object was reasonable. Three of those four were efforts by the Commonwealth to explain its reliance on the testimony of Johnston's co-conspirators.[16] The fourth was a somewhat overstated, but acceptable, attempt by the Commonwealth to set forth its theory as to Johnston's motive for committing the murders.[17] A fifth statement was clearly, in context, a slip of the tongue by the prosecutor, and Goldberg's failure to object could not have been prejudicial.[18]

The two remaining instances cited by Johnston appear to be cases in which an objection would likely have been sustained. The first was the prosecutor's statement that

"Norman tells you a couple of other things, that the night of the ambush he just beat the police home—the night of the ambush he just beat the police home, and that is the testimony that came from Trooper Yoder, and that is the testimony that came from Agent Carr...." Tr., 3/14/80, at 5284–85. There appears to be no support in the record for the proposition that Norman Johnston had testified that he had "just beat the police home." The prosecutor's attribution of such testimony to Norman Johnston was almost certainly another slip of the tongue. Very likely, the prosecutor meant to attribute this statement to Yoder and to Carr, but not to Johnston; the fact that he seems to have repeated himself suggests that the second part of his statement may have been intended to correct the first.

standard is related to, but distinct from, the standard for ineffective assistance of counsel through failure to object to the Commonwealth's closing.

16. Johnston asserts that the prosecutor's closing referred to the defendants as "crooks, burglers, killers." Tr. at 5255, 3/14/80. An examination of the record reveals that the prosecutor was principally referring to the Commonwealth's own witnesses, and was explaining that the jury should not be surprised that they were of poor character, because a person of good character would be less likely to witness a crime of this sort. This argument was not notably unfair.

Johnston also cites the prosecutor's statement that it was necessary to "deal with those people who are less culpable, who are less guilty, in order to get at those who are more guilty." This statement was made in the context of an explanation of the Commonwealth's reason for using the testimony of the defendant's co-conspirators against him. As the Superior Court observed in its opinion ruling on Johnston's direct appeal, the statement was likely to assist the jury in understanding "why the Commonwealth was relying so heavily upon the testimony of acknowledged criminals or individuals who had some involvement in the crimes committed." *Commonwealth v. Norman L. Johnston*, No. 01587, slip op. at 10 (Pa.Super. May 31, 1990).

Finally, Johnston objects to the prosecutor's references to the fact that the plea agreements of two of the Commonwealth's witnesses, Mitchell and Dale, had been approved by judges. The context of the prosecutor's statement indicates that it was his intention to ensure that the jury did not think that plea bargaining was a secret or unsavory event, and therefore discount the testimony of Mitchell or Dale. It is possible that such a statement could be made inappropriately,

for instance if the prosecutor suggested that the plea agreements indicated that the judge had agreed with the witness's account of the facts. The Commonwealth's statement here was not an inappropriate one.

17. The Commonwealth's theory was that Norman Johnston committed the murders in order to conceal his past participation in thefts committed jointly with his family members. The prosecutor argued that the murder victims were potential witnesses against one family member, Bruce Johnston, Sr., and "if Bruce Johnston, Senior crumbles because of the testimony of these kids, then they all go down." Tr. at 5353. In the context of describing this theory, the prosecutor referred to the Johnstons as a "family of crime," the statement to which petitioner objects. In another context, this statement might be inappropriate, as it might indicate (for instance) a genetic predisposition to crime. Here, however, the prosecutor had just observed that the three Johnston brothers admitted having jointly committed a number of crimes. Thus, it would be reasonable to read his remarks as a figuratively somewhat hyperbolic—but not grossly denigrating—reference to the Commonwealth's theory as to the petitioner's motive.

18. This statement was his assertion that "Norman tells you that it was a twenty-two caliber bullet that was used." Tr., 3/14/80, at 5308. Although Norman Johnston did not make such a statement, Mitchell did, Tr., 2/21/80, at 2295. The context of the prosecutor's statement makes clear that he misspoke in referring to "Norman"; his previous statements were references to Mitchell's testimony. It seems very unlikely indeed that this error would have confused the jury.

An objection might also have been an appropriate response to the prosecutor's reference to the petitioner's having allegedly put a "contract" on Mitchell's life. Tr. at 5313. The prosecutor did not purport to raise this evidence in the course of a discussion of Mitchell's motives for testifying, but referred to it in the course of a prolonged listing of what he called "the supporting evidence with respect to the triple killing." *Id.* This use of the evidence was inappropriate, and an objection to this statement would presumably have been sustained.

█ Goldberg may well have had some strategic reason for not objecting to these two statements; he may have thought, for instance, that repeated objections during a closing argument would hurt his client in the eyes of the jury. Goldberg's reasons are not before this court. Even supposing, however, that Goldberg's failure to object was not a strategic decision, I cannot say that, had he objected, "there is a reasonable probability that the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. As to the prosecutor's statement that Norman Johnston had testified that he had "just beat the police home," the jury would have almost certainly recognized this remark as a slip of the tongue, both because of its phrasing and because they had heard Johnston's testimony.

█ The prosecutor's reference to the alleged "contract" on Mitchell's life raises somewhat more difficult questions. However, the prosecutor's reference to the "contract" was fleeting; it was one item in a long list of items of misconduct attributed to

Johnston. Tr. at 5313. The jury had already been told that a "contract" existed, as part of the Commonwealth's effort to establish Mitchell's motive in testifying. It is therefore unlikely that much incremental harm was done to the petitioner's case by the prosecutor's inappropriate citation of the "contract" as direct evidence of Johnston's guilt. I find, therefore, that there is not a reasonable probability that, had Goldberg objected, the result of Johnston's trial would have been different.

### III. Conclusion.

I conclude that Johnston's petition for habeas corpus should be denied. An appropriate order follows.

### ORDER

For the reasons set forth in the opinion filed herewith, it is hereby ORDERED that:

1. Judge Rueter's Report and Recommendation is APPROVED and ADOPTED;

2. The petition for habeas corpus is DENIED;

3. Pursuant to 28 U.S.C. § 2253, I hereby issue a certificate of appealability as to (1) Norman Johnston's *Brady* claim and (2) his ineffective assistance of counsel claim.[1]

### REPORT AND RECOMMENDATION

October 18, 1995

THOMAS J. RUETER, United States Magistrate Judge.

### Table of Contents

I    FACTUAL BACKGROUND .................................................... 756
   A.   The Triple Homicide .............................................. 756
   B.   Murder of Robin Miller and Attempted Murder of Bruce, Jr. ........ 757
II   PROCEDURAL HISTORY .................................................... 757
III. DISCUSSION ........................................................... 757

1. As Judge Irenas stated in a recent memorandum:

Recent habeas corpus amendments have created some uncertainty as to whether a district judge may still grant a CPC. *Compare* 28 U.S.C. § 2253(c)(1) (1996) ("[U]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals ...") *with* Fed.R.App.P. 22(a)(b) ("[A]n appeal by the applicant for the writ may not proceed unless a district or a circuit judge issues a certificate of appealability ..."). For the purposes of this ruling, we assume that the phrase "circuit justice or judge" is intended to include district judges. *Geiger v. Morton,* No. 95–5290, 1996 WL 361474 at 19 n. 19 (D.N.J. June 24, 1996).

A. Exhaustion of State Court Remedies ....................................757
    1. Exclusion of Graham Andes' Testimony ..............................760
    2. Prejudice by Conduct of the Trial Judge ...........................761
    3. Admission of Evidence of Petitioner's Prior Bad Acts ...................761
B. Promises to James Griffin ........................................762
    1. General Principles ..........................................762
    2. Agreement with Griffin to Dismiss Conspiracy Charge .................763
    3. Commonwealth's Agreement Not to Charge Griffin with Additional
       Crimes ...............................................764
    4. Reduction of Bail ..........................................765
    5. Federal Immunity Agreement ...................................767
C. Exclusion of Testimony of Graham Andes, Esq............................771
D. Evidence of Prior Bad Acts .......................................773
E. Prejudice by Conduct of the Trial Judge ...............................774
F. Ineffective Counsel ............................................775
    1. Failure to Ask for Mistrial During Testimony of Richard Falasco .........775
    2. Trial Counsel's Failure to Request Permission to Testify ...............776
    3. Trial Counsel's Failure to Object to Testimony Regarding a Contract
       on the Life of Richard Mitchell ..............................776
    4. Trial Counsel's Failure to Object to Testimony of Richard Mitchell
       Implicating Petitioner in Other Murders ..........................777
    5. Failure to Object to Prosecutor's Closing Argument ...................778
RECOMMENDATION ----------------------------------------------------------------------778

Presently before the court is a pro se petition for writ of habeas corpus filed by Norman L. Johnston who was found guilty by a jury on March 18, 1980 of four counts of first degree murder and related crimes. The convictions resulted from the brutal murders of Robin Miller, Wayne Sampson, Dwayne Lincoln and James Johnston and the attempted murder of Bruce Johnston, Jr. Due to the sensational nature of the crimes, the trial attracted much publicity and, as a result, the case was transferred from the Court of Common Pleas, Chester County to Cambria County, Pennsylvania. The Honorable Leonard Sugerman of the Chester County court presided over the trial.

Petitioner, Norman Johnston, is currently incarcerated at the State Correctional Institution at Huntingdon, Pennsylvania, serving four consecutive life sentences as well as twelve and one-half to twenty-five years on related charges to be served consecutive to the life sentences. The petition raises five claims. First, petitioner claims he was denied his right to a fair trial because the prosecution failed to disclose certain deals or promises made to James Griffin, an associate of the defendants, who testified for the Commonwealth. Second, the petitioner argues that the trial court erred in excluding, as irrelevant, the testimony of Graham Andes, Esquire regarding statements made to him by Richard Mitchell, a co-conspirator of the petitioner, who was a witness for the Commonwealth. Third, petitioner alleges that the state court erred in allowing the Commonwealth to introduce into evidence prior bad acts committed by petitioner. Fourth, petitioner claims that the trial judge exhibited bias against him during the testimony of Richard Falasco. Finally, petitioner contends that his trial counsel was ineffective in several respects. Most of the legal issues raised by the petitioner were raised in a petition for habeas corpus filed by petitioner's brother, David, who was jointly tried with the petitioner. In a report and recommendation, dated January 30, 1995, I found these issues to be without merit. By memorandum and order dated July 21, 1995, the Honorable Daniel H. Huyett, 3rd approved my report and denied the petition for habeas corpus relief. *See Johnston v. Price,* 1995 WL 447606 (E.D.Pa. July 26, 1995).[1] For the reasons that follow, the court finds that Norman Johnston's constitutional rights were not violated and that his petition for writ of habeas corpus should also be denied.

1. On August 17, 1995, David Johnston appealed Judge Huyett's decision to the Third Circuit Court of Appeals, docket No. 95–1713.

### I.  *FACTUAL BACKGROUND* [2]

The testimony at trial established that the petitioner together with his two brothers, David K. Johnston and Bruce Johnston, Sr., successfully operated a burglary "ring" in Chester County, Pennsylvania, in association with Richard Mitchell, Leslie Dale, Roy Myers and James Griffin.  The gang also included a group of teenagers, called the "Kiddie Gang," who primarily stole lawn tractors.  Bruce Johnston, Jr., son of Bruce Johnston, Sr., James "Jimmy" Johnston, Dwayne Lincoln, James Sampson and Wayne Sampson were members of this juvenile gang.

In the spring of 1978, Bruce Johnston, Jr. ("Bruce, Jr.") began dating Robin Miller, then fifteen years of age, who encouraged Bruce, Jr. to abandon his life of crime.  In June, 1978, Bruce, Jr. was arrested for the theft of a pickup truck and incarcerated. Robin wrote to Bruce, Jr. nearly every day. In one of her letters to Bruce, Jr., Robin informed him that Bruce Johnston, Sr. and James Sampson had raped her.  Seeking revenge, Bruce, Jr. contacted law enforcement authorities and volunteered to testify against his father, Bruce Johnston, Sr., and others in the "gang", including David Johnston and the petitioner.  (N.T. 2/11/80, 493–96).

Shortly thereafter, Bruce, Jr. testified before a federal grand jury and implicated a number of gang members in crimes involving the interstate transportation of stolen motor vehicles.  As a result of the testimony of Bruce, Jr., a subpoena was served upon his half-brother, James "Jimmy" Johnston, directing James Johnston to appear before the same grand jury on August 16, 1978 (N.T. 2/21/80, 2098).

#### A.  The Triple Homicide

Bruce Johnston, Sr., David Johnston, Richard Mitchell and the petitioner became aware that Bruce, Jr. was cooperating with the police; that James Johnston was under subpoena to appear before the federal grand jury;  and that other members of the "Kiddie

Gang" would probably be called to testify. Fearing the investigation, these four men agreed upon a plan to silence all potential witnesses against them.  They decided that members of the "Kiddie Gang" had to be killed.

Accordingly, Bruce Johnston, Sr. approached James Johnston in Oxford, Chester County, on August 15, 1978, the evening before he was to testify before the federal grand jury, and convinced the younger Johnston that he should not appear the next day in response to the subpoena.  Bruce, Sr. told James Johnston that James was needed to assist in the theft of a lawn tractor during the night of August 16, 1978, and that Bruce, Sr. would hide James from federal authorities until the theft was accomplished and then send James to California until the grand jury investigation had abated.

In accordance with the plan, Bruce, Sr. then escorted James Johnston to a mobile home belonging to Leslie Dale, another member of the gang, and instructed Dale to keep James Johnston "out of sight" until after his scheduled appearance before the grand jury.  (N.T. 2/21/80, 2098).  The next day, when Bruce, Sr. observed Dale and James Johnston driving in a truck, he became upset and gave Dale money to take James Johnston to a motel with instructions to keep James there until Bruce, Sr. returned later during the evening of August 16th.  James Johnston remained with Dale in the motel during the daylight hours of August 16th.  (N.T. 2/21/80, 2103–10).

On the same day, Dwayne Lincoln and Wayne Sampson, two members of the "Kiddie Gang", who were also marked for execution, were approached by the Johnstons and solicited for the tractor theft that was allegedly to take place that night.  Lincoln and Sampson were then taken to the home of the Johnstons' sister, Mary Payne, where they remained during the day.  (N.T. 2/20/80, 2039, 2050, 2076).

While James Johnston, Dwayne Lincoln and Wayne Sampson were secreted, Bruce, Sr., David, Richard Mitchell and the petitioner met at James Griffin's apartment to com-

---

**2.**  The recitation of facts was culled from the trial transcript and the trial court's opinion in *Com-*  *monwealth v. Johnston,* Crim. No. 037779, slip op. at 5–11 (C.P. Chester Co. May 9, 1989).

plete the plan to kill the three members of the "Kiddie Gang." (N.T. 2/25/80, 2535–38). In accordance with the plan, David Johnston gave Mitchell the sum of $50.00 to purchase shovels and lime. (N.T. 2/25/80, 2539–41). Mitchell purchased these items, and he and petitioner drove to a secluded area in Southern Chester County and prepared a large grave. (N.T. 2/21/80, 2106, 2301–14).

During the evening of August 16th, the three members of the "Kiddie Gang", first one boy and then the two others later that evening, were driven to the home of the Johnstons' mother, Louise Johnston, where they were met by Bruce, Sr., David, Mitchell and the petitioner. (N.T. 2/21/80, 2276–77). The boys were advised by Bruce Johnston, Sr. that they were needed to help with a stolen lawn tractor which had become mired in the mud. (N.T. 2/21/80, 2114, 2277–80).

When night fell, the boys were taken to an area near the gravesite and were led, one by one, to the grave. As each arrived at the grave, each was shot in the head and pushed into the grave. James Johnston, the first to die, was shot by Bruce Johnston, Sr.; Dwayne Lincoln was next shot and killed by David Johnston; and Wayne Sampson, the last to die, was shot by Richard Mitchell. The grave was then covered and the conspirators departed.[3] (N.T. 2/12/80, 617–18; 2/21/80, 2285–2300). At trial, this series of crimes was referred to as the "Triple Homicide."

## B. Murder of Robin Miller and Attempted Murder of Bruce, Jr.

Bruce, Jr., who continued to cooperate with the authorities, remained incarcerated at Chester County Prison but was soon transferred to Lancaster County Prison for his safety. On August 25, 1978, Bruce, Jr. was released from Lancaster County Prison on reduced bail and resided at the home of Robin Miller. Although police authorities instructed Bruce, Jr. not to reveal his location and offered him the protection afforded by the federal witness protection program, Bruce, Jr. declined.

Bruce Johnston, Sr., who became aware of Bruce, Jr.'s new residence, offered Bruce, Jr. the sum of $12,000 to recant the testimony he had earlier given before the grand jury. (N.T. 2/11/80, 287–290, 305–07, 356). At the same time, Bruce, Sr. offered as much as $15,000 to anyone who would kill Bruce, Jr. (N.T. 2/12/80, 623–32, 636, 709). The offer was accepted by David Johnston, Mitchell, Dale and the petitioner. (N.T. 2/12/80, 636–41, 660–87; 2/14/80, 1034–38). Pursuant to a prearranged plan, Mitchell, David Johnston and the petitioner regularly surveilled the dwelling in which Bruce, Jr. resided with Robin Miller, in order to ambush Bruce, Jr. at the dwelling. The conspirators planned to kill Bruce, Jr. on the night of August 30, 1978, and all agreed that David Johnston and the petitioner would actually do the killing while Bruce, Sr. and Mitchell would, at the same time, appear and remain in a cocktail lounge in order to provide the latter two with an alibi. (N.T. 2/12/80, 687–704).

At the appointed hour, as David Johnston and the petitioner lay in wait in a field across from the dwelling, Bruce, Jr. and Robin Miller arrived at their residence by automobile. As Bruce, Jr. and Robin were about to alight from the automobile, David Johnston and the petitioner ran to the vehicle and both shot the young couple. Bruce, Jr. was shot nine times, and Robin Miller was shot once, in the throat. Bruce, Jr. miraculously survived, but Robin died at the scene, within moments of the attack. (N.T. 2/11/80, 446–452; 2/18/80, 1366–68).

Following the murder of Robin Miller, the ongoing investigation by the law enforcement authorities into the activities of the John-

---

3. James Sampson, the older brother of Wayne, sometime thereafter, was told by the Johnstons that the three boys had been sent to California and were to remain there until the federal investigation waned. Dissatisfied with this explanation, James demanded to speak with his brother and threatened to contact the police, if he was not permitted to do so. (N.T. 2/27/80, 3119, 3134). Subsequently, James Sampson was shot, killed and buried in a landfill located in Chester County. (N.T. 2/25/80, 2695–2705). Although the Commonwealth charged David Johnston and the petitioner with the murder of James Sampson, the jury found them not guilty of the charges. Bruce Johnston, Sr., who was subsequently tried separately, was found guilty of Sampson's murder.

stons intensified. As a result, Dale, Mitchell, Griffin and other gang members were arrested for various gang activities, and all agreed to cooperate as Commonwealth witnesses. The authorities were led to the common grave containing the bodies of James Johnston, Dwayne Lincoln and Wayne Sampson. (N.T. 2/21/80, 2239–2275). Dale, Mitchell, Griffin and the others provided the authorities with additional information concerning all the murders and other gang activities.

On January 29, 1979, David Johnston and the petitioner were each charged with five counts of criminal homicide (murder), one count of criminal conspiracy, criminal attempt-criminal homicide, aggravated assault, and a weapons offense. On the same date, Bruce Johnston, Sr. was charged with the same crimes and an additional count of criminal homicide (murder) involving one Gary Wayne Crouch. Following preliminary hearings, the three Johnstons were held for trial. Informations were subsequently filed against the three and the cases were consolidated for trial.

As stated earlier, the court transferred venue from Chester County to Cambria County because of massive pretrial publicity. As the result of the additional charge of criminal homicide lodged against Bruce Johnston, Sr. prior to trial, his case was severed from those of his two brothers.

On January 29, 1980, the joint trial of David Johnston and the petitioner commenced. The Commonwealth and the defense presented, in all, nearly 150 witnesses during the 23 days of trial, and on March 18, 1980, the jury returned the aforementioned verdicts. (N.T. 3/18/80, 5664–67).

## II. *PROCEDURAL HISTORY*

After disposition of post-trial motions, Judge Sugerman sentenced petitioner to four (4) consecutive life sentences on the murder conviction and twelve and one-half (12½) to twenty-five (25) years on the related charges to be served consecutive to the life sentences.

Petitioner filed a direct appeal to the Pennsylvania Superior Court (No. 3030 Phila.1983). Prior to the disposition of the direct appeal, petitioner filed a motion requesting a new trial on the basis of alleged after-discovered evidence. Subsequently, the Superior Court remanded the case to Judge Sugerman for a hearing on the after-discovered evidence allegations. On May 26, May 27 and June 10, 1987, Judge Sugerman held evidentiary hearings with respect to the after-discovered evidence allegations made by petitioner, by his co-defendant, David Johnston and by Bruce Johnston, Sr. who had been tried separately. On May 9, 1989, Judge Sugerman issued a 343 page opinion addressing the issues raised by petitioner on direct appeal and in the motion for a new trial based upon after-discovered evidence. *Commonwealth v. Johnston*, Crim. No. 037779 (C.P. Chester Co. May 9, 1989).

On June 8, 1989, petitioner filed a separate appeal from that portion of Judge Sugerman's ruling denying the motion for a new trial based upon alleged after-discovered evidence (No. 1587 Phila.1989). Both that appeal and the original direct appeal, No. 3030 Phila.1983, were consolidated. On May 31, 1990, the Superior Court affirmed the petitioner's conviction and sentences, including the denial of petitioner's motion for new trial based on after-discovered evidence. *Commonwealth v. Johnston*, 402 Pa.Super. 655, 578 A.2d 38 (1990). A petition for allowance of appeal to the Supreme Court of Pennsylvania was docketed at No. 610 E.D. Allocatur Docket 1990 and denied by the supreme court on May 14, 1991. On June 14, 1995, petitioner filed his petition for a writ of habeas corpus in this court raising the five aforementioned claims.

## III. *DISCUSSION*

### A. Exhaustion of State Court Remedies

The Commonwealth claims that petitioner failed to exhaust his state court remedies with respect to three of his federal claims: the exclusion of the testimony of Graham Andes, Esquire; the bias of the trial judge; and the admission of evidence of petitioner's prior bad acts. Hence, the Commonwealth claims that petitioner's habeas corpus petition contains a combination of exhausted and unexhausted claims, i.e., it is a "mixed peti-

tion", which must be dismissed in its entirety in accordance with *Rose v. Lundy*, 455 U.S. 509, 519–20, 102 S.Ct. 1198, 1203–04, 71 L.Ed.2d 379 (1982). As discussed below, this court finds that petitioner did exhaust his state court remedies with respect to these issues.

In *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) and *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971), the Court held that a state prisoner must exhaust his state court remedies before applying for a federal writ of habeas corpus. *See also Ex parte Royall*, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886) (same); 28 U.S.C. §§ 2254(b) and (c). The exhaustion doctrine is designed to give states the initial opportunity to pass upon and correct alleged violations of their prisoners' federal rights. *Picard*, 404 U.S. at 275, 92 S.Ct. at 512.

In *Picard* and *Harless*, the Court held that the exhaustion requirement is satisfied if the federal claim was *"fairly presented* to the state courts." *Picard*, 404 U.S. at 275, 92 S.Ct. at 512 (emphasis added). *And see Harless*, 459 U.S. at 6, 103 S.Ct. at 277. It is not sufficient that all the facts necessary to support the federal claim were before the state court or that a similar state law claim was made. *Harless, id.* (citing *Picard*, 404 U.S. at 276–77, 92 S.Ct. at 512–13). Rather, the "substance" of the federal claim must have been fairly presented to the state courts. *Harless*, 459 U.S. at 6, 103 S.Ct. at 277; *Picard*, 404 U.S. at 278, 92 S.Ct. at 513. The Court cautioned, however, that this does not mean that the only way a habeas petitioner can fairly present a federal claim to the state courts is by citing "book and verse on the federal constitution." *Picard*, 404 U.S. at 277–78, 92 S.Ct. at 513–14.

In *Picard*, the highest state court rejected the habeas petitioner's challenge to the legality of his indictment made on the ground that the amendment of the indictment did not comply with state law. The Court concluded that the petitioner failed to satisfy the exhaustion requirement because the claim that an indictment is invalid is not the "substan-

tial equivalent" of a claim that it resulted in denial of equal protection. 404 U.S. at 278, 92 S.Ct. at 513. The Court disagreed with the court of appeals which determined that the habeas petitioner provided the state court with "an opportunity to apply controlling legal principles to the facts bearing upon [his] constitutional claim." *Id.* at 277, 92 S.Ct. at 513 (quoting *Connor v. Picard*, 434 F.2d 673, 674 (1st Cir.1970)). On the contrary, the Court concluded that although the petitioner presented all of the facts to the state courts, the "constitutional claim the court of appeals found inherent in those facts was never brought to the attention of the state courts." 404 U.S. at 277, 92 S.Ct. at 513. While it did not fault the state courts for failing to consider *sua sponte* whether the indictment procedure denied petitioner equal protection of the laws, the Court noted that "[o]bviously there are instances in which 'the ultimate question for disposition', . . . , will be the same despite variations in the legal theory or factual allegations urged in its support." 404 U.S. at 277, 92 S.Ct. at 513 (quoting *United States ex rel. Kemp v. Pate*, 359 F.2d 749, 751 (7th Cir.1966)).

In *Harless*, the Court reversed the Sixth Circuit Court of Appeals which had concluded that the habeas petitioner had satisfied the exhaustion requirement. 459 U.S. at 5–6, 103 S.Ct. at 276–77. The court of appeals determined that because the habeas petitioner argued in the state courts that a particular jury instruction was reversible error and cited in his brief to a state court case in which the defendant had argued broadly that the failure to give proper jury instructions violates the Sixth and Fourteenth Amendments, the habeas petitioner's due process arguments were self-evident and "presented to state courts . . . the substance of his due process challenge to the . . . instruction for habeas exhaustion purposes." *Id.* at 6, 103 S.Ct. at 277 (quoting *Harless v. Anderson*, 664 F.2d 610, 612 (6th Cir.1981)). In reversing the court of appeals, the Court stated "it is plain from the record that this constitutional argument was never presented to, or considered by, the Michigan courts." 459 U.S. at 7, 103 S.Ct. at 278.[4]

4. The Court also concluded that the constitution-

al claim advanced in the state court case on

The Court recently reaffirmed the continued vitality of *Picard* and *Harless* in *Duncan v. Henry*, —— U.S. ——, ——, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995). In *Duncan*, a habeas petitioner argued in state court that the trial court made an evidentiary error which was a miscarriage of justice under the California Constitution. *Id.* at ——, 115 S.Ct. at 887. In his habeas corpus petition in federal court, the petitioner argued that the evidentiary error amounted to a denial of his Fourteenth Amendment right to due process. The Court concluded that the habeas petitioner did not apprise the state court of his Fourteenth Amendment claim. The Court further stated that "[t]he failure is especially pronounced in that respondent did specifically raise a due process objection before the state court based on a different claim—that the pleading was uncertain as to when the offense occurred." *Id.* at ——, 115 S.Ct. at 888. The Court concluded that the state court, in the record before it, "understandably confined its analysis to the application of state law." *Id.* Both the majority and the concurring opinions agreed that *Duncan* is not a departure from prior law; *Picard* and *Harless* continue to govern how a habeas petitioner may satisfy the exhaustion requirement. *Duncan*, —— U.S. at ——, 115 S.Ct. at 888.

Our court of appeals applied these principles of exhaustion in *Lesko v. Owens*, 881 F.2d 44, 50 (3d Cir.1989), *cert. denied*, 493 U.S. 1036, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990). There, the court of appeals determined that the *Picard* "fairly presented" standard is satisfied when the claim brought in federal court is "the substantial equivalent of that presented to the state courts." *Id.* "Both the legal theory and the facts supporting a federal claim must have been submitted to the state courts." *Id.*

With these principles in mind, this court will now consider the Commonwealth's argument that the petitioner failed to exhaust his state court remedies on three of his issues.

which the petitioner relied was not the same constitutional claim he advanced. *Harless*, 459

### 1. Exclusion of Graham Andes' Testimony

Petitioner argued in the state courts that the exclusion of Mr. Andes' testimony regarding the trustworthiness and motive of one of the prosecution's main witnesses, Richard Mitchell, was not "fair and just" and that the testimony "must be heard." (Petitioner's Brief filed in Superior Court at 60–62). The Commonwealth admits that the issue of the exclusion of Mr. Andes' testimony was presented as a matter of state evidentiary law to the state courts (Commonwealth's Answer to Petition at 14), but not as a federal constitutional claim. Petitioner concedes that he did not fairly present this issue to the state courts under the "strict pleading requirement in *Duncan v. Henry*". (Petitioner's Memorandum of Law in Support of Petition at 31).

As stated above, the Court in *Duncan* did not create new strict pleading requirements for federal habeas corpus cases. The pleading requirements as set forth in *Picard* and *Harless* continue to control. Although petitioner did not cite "book and verse" to the Constitution, his argument is substantially equivalent to claims that he was denied his Sixth Amendment right to compel the attendance of favorable witnesses at trial and his Fourteenth Amendment right to due process and a fair trial. The facts (the substance of Mr. Andes' testimony) and the legal theory (exclusion of the testimony was not "fair and just" and the testimony "must" be heard) were before the state courts and, therefore, with respect to this claim, petitioner satisfied the exhaustion requirement.

Even if the Court in *Duncan* had created new strict pleading requirements which petitioner here failed to meet, this court would nonetheless find an exception to the exhaustion requirements in this situation. Here, the state courts had already rejected an identical constitutional claim relating to Mr. Andes' testimony which was made by petitioner's co-defendant, David Johnston. As this court noted in its report and recom-

U.S. at 7, 103 S.Ct. at 277–78.

mendation in David Johnston's case, the Commonwealth there conceded that David satisfied the exhaustion requirements on this Sixth Amendment issue. In a situation such as this, the exhaustion requirements would be excused on the grounds of futility. Exhaustion is a matter of comity, not jurisdiction. *Story v. Kindt,* 26 F.3d 402, 405 (3d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 593, 130 L.Ed.2d 506 (1994). Here, "[n]o federalism purpose would be served by requiring petitioner personally to raise the issue again." *United States ex rel. Cunningham v. DeRobertis,* 719 F.2d 892, 895 (7th Cir.1983). *See also Stanley v. Wainwright,* 604 F.2d 379, 381 (5th Cir.1979), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3019, 65 L.Ed.2d 1118 (1980) (same).

## 2. Prejudice by Conduct of the Trial Judge

The petitioner also argued in the state courts that the trial judge's act of leaning over the bench with his glasses lowered and staring at petitioner's counsel during the testimony of Mr. Falasco, which testimony suggested that petitioner's counsel was involved in a plot to have Mr. Falasco present false testimony to the court, placed the character of petitioner's counsel into question, left counsel so shaken that he could not effectively continue with the defense, and deprived petitioner of a fair and impartial trial. (Petitioner's Brief filed in Superior Court at 22–23).

■ While the petitioner is silent on exactly what federal right he believes the trial judge's behavior invaded, it is clear that petitioner is again raising a claim that his Fourteenth Amendment due process right to a fair trial was compromised. *See Garcia v. Warden, Dannemora Correctional Facility,* 795 F.2d 5, 8 (2d Cir.1986); *United States ex rel. Perry v. Cuyler,* 584 F.2d 644, 645 (3d Cir.1978), *cert. denied,* 440 U.S. 925, 99 S.Ct. 1257, 59 L.Ed.2d 480 (1979). The facts (the trial judge's behavior) and the legal theory (petitioner's ability to receive a fair trial) were before the state courts and, therefore, with respect to this claim, petitioner satisfied the exhaustion requirement.

## 3. Admission of Evidence of Petitioner's Prior Bad Acts

Petitioner argues that the trial court erred in admitting testimony regarding his prior criminal activities which were not at issue at trial. The Commonwealth argues that petitioner raised this issue in the state courts solely in terms of a violation of state evidentiary laws, not as a federal constitutional claim.

In his brief filed in the Superior Court of Pennsylvania, the petitioner argued that reference to prior criminal activity is impermissible except in the case of certain specific exceptions which include showing motive and intent. The petitioner argued that even if the evidence of prior criminal activity is relevant to one of these exceptions, "there must be a balancing test to establish that the probative value is not outweighed by the prejudicial effect." (Petitioner's Brief filed in Superior Court at 26–7). The state courts rejected petitioner's argument that the prejudicial effect of the testimony outweighed its probative value. In his federal habeas petition, the petitioner argued that the allowance of testimony regarding prior criminal activity over his counsel's objections denied him a fair trial under the Fourteenth Amendment.

As stated earlier, our court of appeals applied the *Picard* "fairly presented" standard in *Lesko v. Owens.* In *Lesko,* the state courts rejected the petitioner's argument that the trial judge erred in admitting certain testimony regarding another murder committed by petitioner because its probative value was outweighed by its prejudicial effect. In the petitioner's federal habeas petition, he alleged that he was denied his right to a fair trial in violation of the Fourteenth Amendment because the probative value of the testimony was outweighed by the prejudicial effect. The court of appeals concluded that the petitioner satisfied the exhaustion requirement because the legal theory (the probative value of evidence versus its prejudicial effect) and the facts (the substance of the testimony) on which petitioner's federal claim rested, had been submitted to the state courts. *Lesko,* 881 F.2d at 50.

The petitioner here, like the petitioner in *Lesko*, did not phrase his claim of error in state court in terms of the federal Constitution. However, because the legal theory (petitioner deprived of a fair trial because the prejudicial effect of the testimony outweighed its probative value) and the facts (the substance of the testimony) before the state courts are substantially equivalent to those raised by petitioner in his federal habeas petition (allowance of the testimony over objection deprived petitioner of a fair trial and the substance of the testimony), the petitioner has satisfied the exhaustion requirements.[5]

For all the foregoing reasons, the court finds that the petitioner has exhausted his state court remedies on all his federal claims. The court therefore will address the merits of these contentions.

## B. Promises to James Griffin

The first issue raised by the petitioner concerns James Griffin, an associate of the defendants, who testified for the Commonwealth. Griffin testified on four separate occasions during the trial, namely, on February 18, 25, 27 and March 10, 1980. He told the jury he had no "deal" with the Commonwealth in return for his testimony. (N.T. 2/18/80, 1502). Although he was not an eyewitness to the murders, Griffin related several conversations he overheard between the petitioner and his brothers, David and Bruce, Sr. On several occasions, Griffin overheard the petitioner and David discussing the murder of Robin Miller and the shooting of Bruce, Jr. During these discussions, the petitioner and David clearly implicated themselves in the crimes. (N.T. 2/18/80, 1509–10, 1512–13, 1515, 1520, 1528–29, 1531–38, 1546; 2/27/80, 3134–36).

Griffin further testified that on the morning of August 16, 1978, he overheard the petitioner, David, and Bruce Johnston, Sr.

discussing their plans to bury "some snitches." (N.T. 2/25/80, 2535–40). They asked Griffin if he wished to assist, and Griffin declined. (N.T. 2/25/80, 2540). However, Griffin, the petitioner and David drove Richard Mitchell to a local hardware store where Mitchell bought shovels and lime used to bury the murder victims. (N.T. 2/25/80, 2539). David told Griffin that lime was used for the burial, since it would "eat the whole human body up, bones, flesh, hair and all." (N.T. 2/25/80, 2551). Griffin also stated that David Johnston, on several occasions, admitted that he participated in the killing of James Sampson. (N.T. 2/18/80, 1521; 2/27/80, 3119, 3136).

Petitioner claims that the Commonwealth failed to disclose three separate benefits it bestowed upon Griffin in exchange for his testimony. First, petitioner alleges that the Commonwealth had a plea agreement with Griffin whereby it agreed to dismiss a pending criminal charge against Griffin and forego charging him with other crimes, in exchange for his testimony. This alleged plea agreement was not disclosed to the defense. Second, petitioner alleges that Griffin was also released from pretrial detention on favorable bail conditions in exchange for his testimony, and that this fact was not disclosed prior to trial. Last, petitioner asserts that the United States Attorney's office granted informal use immunity to Griffin in exchange for his testimony, and that this immunity agreement was also not disclosed to the defense.

Petitioner alleges that had these agreements been disclosed, defense counsel would have used these favorable deals to impeach the credibility of Griffin. The state court considered petitioner's claims and denied them after holding an evidentiary hearing.

### 1. General Principles

The United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct.

---

5. In his federal petition, the petitioner did not mimic the "prejudice versus probative value" balancing argument he presented in the state courts. However, the substance of his argument, i.e. allowance of testimony regarding his prior criminal activity deprived petitioner of a fair trial, is the same in both forums. Moreover, in *Lesko*, the court of appeals recognized that peti-

tioner's argument raises an issue under the Fourteenth Amendment and determined that, with this type of issue, the reviewing court must perform a balancing analysis and "examine the relative probative and prejudicial value of evidence to determine whether its admission violated defendant's right to a fair trial." *Lesko*, 881 F.2d at 51.

1194, 10 L.Ed.2d 215 (1963), held that the government must volunteer "evidence favorable to an accused on request ... where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. In *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Court expanded this rule to include evidence that may be used to impeach an important government witness. In short, the prosecution must disclose materials "that go to the heart of the defendant's guilt or innocence and materials that might affect the jury's judgment of the credibility of a crucial prosecution witness." *United States v. Hill,* 976 F.2d 132, 134–35 (3d Cir.1992) (citing *Giglio,* 405 U.S. at 154, 92 S.Ct. at 766). Thus, in order to earn a new trial based on newly-discovered impeachment materials, the court must find that there is a reasonable probability that the result of the petitioner's trial would have been different had the defense been able to use the undisclosed material to cross-examine Griffin. *See United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). In discovering whether a new trial is warranted, the court must consider the suppressed favorable evidence "collectively, not item by item." *Kyles v. Whitley,* —— U.S. ——, ——, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995).

### 2. Agreement with Griffin to Dismiss Conspiracy Charge

In 1978, James Griffin was incarcerated in Miami, Florida. The incarceration resulted from a burglary charge lodged by the Pike County, Pennsylvania District Attorney with Florida authorities. (N.T. 5/27/87, 224–25). While in Florida, the Chester County District Attorney filed a criminal complaint against Griffin, charging him with conspiracy to commit criminal homicide. This charge pertained to the triple homicides occurring on August 16, 1978. Griffin returned to Pennsylvania on February 15, 1979 to answer the conspiracy charge. (N.T. 5/26/87, 50–51; 5/27/87, 11–12).

The conspiracy charge was pending against Griffin throughout the trial of petitioner and the subsequent trial against Bruce Johnston, Sr. After these trials, on February 13, 1981, the Commonwealth presented a petition for a *nolle prosequi ("nol pros")* of the conspiracy charge against Griffin. The Commonwealth stated that it was dismissing the charge because it was "unable to establish a prima facie case." (N.T. 5/26/87, 16–17). The petitioner asserts that the Commonwealth promised Griffin to *nol pros* the conspiracy charge in exchange for Griffin's testimony at the defendants' trial, and this deal was not disclosed to the defense. The Commonwealth argues that there was no deal with Griffin; that the investigation of the charge against Griffin continued through the trial of Bruce Johnston, Sr., and only after that trial concluded, did the District Attorney's Office conclude that a *nol pros* was appropriate. (N.T. 6/10/87, 68–70).

Petitioner raised the issue in a petition for a new trial filed in the state court. On May 26, May 27 and June 10, 1987, Judge Sugerman heard extensive testimony on the issue and found as a fact that no plea agreement existed between Griffin and the Commonwealth.

At the evidentiary hearing, Griffin categorically denied that he had a plea bargain with the Commonwealth. (N.T. 5/27/87, 38–41). Counsel for Mr. Griffin, Michael B. Kean, Esquire, also testified that he represented Griffin before and during the petitioner's trial, and that he was aware of no promises, offers or plea bargains made to *nol pros* the criminal charge against Griffin. (N.T. 5/26/87, 57–59, 97–99, 123–24, 154, 167–69, 174–75, 178–80).[6] Prosecutors, William H.

---

**6.** Mr. Kean's primary motive in agreeing to have Mr. Griffin testify without a plea bargain was to have his client avoid a sentence which included a term of imprisonment. (N.T. 5/26/87, 59–60, 116). Counsel further testified that he knew, based on his "experience", that if his client cooperated fully with the Chester County authorities, he would be treated "fairly" by them when they decided what sentence Mr. Griffin should receive and whether additional criminal charges would be filed. (N.T. 5/26/87, 123–24, 126, 169). Counsel's expectation of leniency did not have to be disclosed to the defense, assuming the Commonwealth was aware of it. *See Alderman v. Zant,* 22 F.3d 1541, 1555 (11th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994) (a belief by an attorney "that his client may be in a better position to negotiate a

Lamb, Esquire, Dolores M. Troiani, Esquire, and Joseph W. Carroll, Esquire, all testified that there was no agreement or understanding of any kind between the Commonwealth and Griffin in exchange for his testimony. (N.T. 6/10/87, 19, 70–72; 5/27/87, 112–13, 123, 134, 147, 160, 192).[7] The principal state investigators assigned to the case, Charles Zagorskie, Chief of Chester County Detectives, and state trooper Thomas Cloud, both testified that law enforcement officials never promised Griffin anything in exchange for his testimony. (N.T. 5/27/87, 222–23, 249).

Judge Sugerman found, from this evidence, "that at no time did the Commonwealth offer to *nol pros* the conspiracy charge against Griffin in exchange for Griffin's testimony or cooperation." Rather, the court concluded that the decision to dismiss the charge was based upon "sound, reasoned prosecutorial judgment." *Commonwealth v. Johnston,* Crim. No. 037779, slip op. at 197. The Superior Court found no error in this finding. *Commonwealth v. Johnston,* 402 Pa.Super. 655, 578 A.2d 38 (1990).

This court is bound by Judge Sugerman's finding, affirmed on appeal, that there was no agreement to *nol pros* the conspiracy to commit murder charge in exchange for Griffin's testimony. A federal court in a habeas corpus proceeding is required to accord a presumption of correctness to state court findings of fact. 28 U.S.C. § 2254(d); *Burden v. Zant,* 498 U.S. 433, 436–37, 111 S.Ct. 862, 864–65, 112 L.Ed.2d 962 (1991); *Sumner v. Mata,* 455 U.S. 591, 592, 102 S.Ct. 1303, 1304, 71 L.Ed.2d 480 (1982); *Sumner v.*

*Mata,* 449 U.S. 539, 547–48, 101 S.Ct. 764, 769–70, 66 L.Ed.2d 722 (1981). The habeas corpus statute explicitly provides that "a determination after a hearing on the merits of a factual issue, made by a state court of competent jurisdiction . . ., shall be presumed to be correct." The presumption is inapplicable only when one of seven specified factors is present or the federal court determines that the state court finding of fact "is not fairly supported by the record." 28 U.S.C. § 2254(d); *Sumner v. Mata,* 455 U.S. at 592, 102 S.Ct. at 1304.

Judge Sugerman's findings are amply supported by the record and none of the exceptions to the presumption of correctness requirement are applicable. Therefore, given Judge Sugerman's finding that there was no agreement to *nol pros* the conspiracy charge against Griffin in return for his testimony, this court, *a fortiori,* finds that no *Brady/Giglio* violation occurred for failure to disclose such an agreement.[8]

### 3. Commonwealth's Agreement Not to Charge Griffin With Additional Crimes

During pretrial interviews with various law enforcement authorities prior to petitioner's trial, Griffin admitted to participation in as many as 150 crimes, including burglaries, robberies and thefts. (N.T. 5/27/87, 17, 37, 72–73). Griffin freely admitted to committing these crimes during cross-examination at petitioner's trial. (N.T. 2/18/80, 1575, 1577–78, 1598). As noted by petitioner's attorney in his closing argument to the jury, Griffin was never criminally charged with

reduced penalty should he testify against a co-defendant is not an agreement within the purview of *Giglio* ").

**7.** As evidence that there was a plea agreement, petitioner cites to the Commonwealth's application for a continuance of Griffin's trial date for the conspiracy to commit murder charge. Prosecutor Troiani, who drafted the application, acknowledged that the petition erroneously stated that there was a plea agreement between the Commonwealth and Griffin and that it was her mistake for using that language. (N.T. 5/27/87, 121–24). At the evidentiary hearing, Ms. Troiani emphatically stated that there was no plea bargain with Griffin. (N.T. 5/27/87, 112–13, 123,

134, 147, 160). Judge Sugerman "fully credit[ed]" Ms. Troiani's testimony that she made a "drafting error" in the application filed with the court. *See Commonwealth v. Johnston,* Crim. No. 037779, slip op. at 178–79.

**8.** The second ground raised by petitioner is that the prosecutor improperly failed to correct Griffin's incorrect and misleading testimony that he had no deal with the Commonwealth. As stated above, the trial court found that no such deal existed and this court is bound by that finding. Consequently, there was no incorrect testimony for the prosecutor to correct and this claim of error is without merit.

any of these many crimes. (N.T. 3/13/80, 5162–63).

Petitioner argues that the Commonwealth agreed not to charge Griffin with this multitude of crimes in exchange for his trial testimony against petitioner. William Lamb, Esquire, the lead prosecutor, testified that, while Griffin's cooperation was an important consideration, "the chief motivating factor" for not charging Griffin with the additional crimes was insufficient evidence to establish all the elements of the crimes. (N.T. 6/10/87, 9–14).[9] Griffin's counsel, Mr. Kean, confirmed that there was no bargain, promise or "understanding" on the part of the Commonwealth that his client would not be prosecuted for the numerous crimes he disclosed during his proffers with law enforcement officers. (N.T. 5/26/87, 123–24, 154, 167–69).

After hearing extensive testimony on the subject, Judge Sugerman found that the petitioner failed to establish that the Commonwealth promised or agreed not to prosecute Griffin with these additional crimes in exchange for his testimony or cooperation. *Commonwealth v. Johnston,* Crim. No. 037779, slip op. at 190–91. This finding will not be questioned by this court. *See* 28 U.S.C. § 2254(d) and cases cited *supra* p. 764. Accordingly, petitioner's argument that the Commonwealth did not fulfill its *Giglio* obligations by disclosing this agreement to forego additional criminal charges in exchange for Griffin's testimony is without merit.

### 4. Reduction of Bail

After his arrest in Florida and transfer to Pennsylvania, Griffin was incarcerated in Chester County Prison and then Lancaster County Prison, in default of the posting of bail in the sum of $50,000. (N.T. 5/27/87, 21–22). On or about April 24, 1979, the Commonwealth filed a motion to reduce Griffin's bail to the sum of $1.00. The court reduced Griffin's bail to the sum of $1.00, subject to the following conditions:

1. Griffin is to live in the place designated by the District Attorney's Office or if he finds new suitable lodging, that place, if approved by the District Attorney's Office.

2. Griffin is to maintain the job secured by the District Attorney's Office or if he finds one more suitable, he may change jobs, if the District Attorney's Office approves. He is to use his earnings to defray the cost of his living expenses.

3. Griffin must report in person to the local law enforcement official designated by Chief Charles Zagorskie, twice a week. He is to call Chief Zagorskie or Chester County Detective Larry Dampman or Assistant District Attorney Dolores M. Troiani, once a week.

4. He is to make himself available to testify whenever needed.

5. He is prohibited from telling anyone where he is and may only meet with his friends and relatives by arrangements made with the District Attorney's Office.

6. He is not permitted to tell anyone at the new location about his involvement in the Johnston cases.

7. Any correspondence to his associates will be placed in an envelope and mailed to Chief Zagorskie who will forward the correspondence.

---

**9.** Petitioner, citing the transcript of Mr. Lamb's testimony, argues that Lamb made the decision not to charge Griffin with additional crimes *prior* to petitioner's trial, and this decision should have been disclosed to the defense. (N.T. 6/10/87, 12–13). This court does not read Mr. Lamb's testimony as being so favorable to the petitioner. During the post-trial hearing, Lamb clarified his answer by explaining that he never made an affirmative decision whether or not to charge Griffin with additional crimes, but admitted he did not file any new charges prior to petitioner's trial. (N.T. 6/10/87, 53–54). It is clear that Mr. Lamb's statement that he decided not to file additional charges refers to his "inaction" as opposed to any affirmative act. (N.T. 6/10/87,

54). The defense learned of the prosecutor's "inaction" when Griffin admitted during cross-examination that he had not been charged with additional crimes. In any event, as Judge Huyett has stated, even if the record establishes that prior to the trial Mr. Lamb decided not to prosecute Griffin for additional crimes, "the record does not suggest that any explicit or implicit understanding, agreement, or arrangement existed between Griffin and the Commonwealth." *Johnston v. Price,* 1995 WL 447606, at \*3 (E.D.Pa. July 26, 1995). Hence, there is no *Brady* violation by the alleged failure to disclose that Griffin was not charged with additional crimes.

8. He is not permitted to make any collect calls. Exhibit D–6.

To assist Griffin in paying his living expenses pending his securing employment, the county detectives also gave Griffin approximately $300. (N.T. 5/27/87, 50, 212–13; 6/10/87, 17–18).

The Commonwealth's application to reduce the bail and the court's order releasing Griffin were impounded and not disclosed to the defense counsel. (N.T. 5/26/87, 81–84; 6/10/87, 59–61). The petitioner contends that the decision to release Griffin on bail and the payment of relocation money was the *quid pro quo* given by the Commonwealth in exchange for Griffin's testimony and thus an unrevealed promise made by the Commonwealth to Griffin.

The testimony of the prosecutors and other law enforcement officers before the state court, however, conclusively established that Griffin was released on bail solely because of concern about Griffin's safety in prison as his cooperation with the Commonwealth became known to the petitioner and his brothers. This concern was completely justified since petitioner and his brothers were charged with murdering five individuals in an effort to prevent them from testifying for law enforcement authorities.

Griffin testified that he told authorities that he might be killed since the petitioner and his brothers, who were incarcerated in the same prison, were continually threatening him. (N.T. 5/27/87, 51, 99). Griffin's attorney, Mr. Kean, was also concerned about Griffin's safety. (N.T. 5/26/87, 162). The prosecutors and detectives assigned to the case also feared for Griffin's safety and attempted to have him admitted to the federal witness protection program, but could not at the time he was released on bail. (N.T. 5/27/87, 128, 135–37, 204–05; 6/10/87, 17, 28, 62).

Accordingly, the conditions of bail were fashioned to protect Griffin from physical harm. They were akin to those imposed on participants of the federal witness protection program. For example, county detectives were to regularly monitor Griffin's activities, including his mail, and Griffin was forbidden to tell anyone where he resided. He was not permitted to make collect phone calls and his employment had to be approved by the District Attorney's Office. These restrictions corroborated the testimony of law enforcement officials that Griffin was released from prison for his own safety, not as a reward for his testimony.

This court agrees with petitioner that Griffin's receipt of $300 in relocation expenses and his release from incarceration at the request of the Commonwealth should have been disclosed by the prosecution as potential impeachment material. Although Griffin did not explicitly agree to testify in exchange for $300 and a bail modification order, one of the purposes of the money and the release order was to eliminate Griffin's fears of testifying for the Commonwealth. (N.T. 5/27/87, 51, 99, 127–28). These benefits may have motivated him to testify and thus, should have been disclosed to the defense. *See Alderman v. Zant*, 22 F.3d 1541, 1554–55 (11th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994) (the purpose of *Giglio* is "to ensure that the jury know the facts that motivate a witness to testify"); *United States v. Thornton*, 1 F.3d 149, 157–58 (3d Cir.), *cert. denied*, 510 U.S. 982, 114 S.Ct. 483, 126 L.Ed.2d 433 (1993) (payments made by DEA to cooperating government witnesses required to be disclosed to defense); *United States ex rel. Thomas v. Brierton*, 408 F.Supp. 14, 21 (N.D.Ill.1976), *aff'd without op.*, 577 F.2d 746 (7th Cir.1978) (government witness' release on bail after his arrest and dismissal of his case a month after he testified suggests favorable treatment in exchange for testimony). Nonetheless, this disclosure could not, with any reasonable likelihood, have affected the judgment of the jury.

While Griffin was an important witness for the Commonwealth, he was not the only witness. Co-conspirators, Richard Mitchell, Leslie Dale and Roy Myers, and a fellow prison inmate, Richard Falasco, also provided incriminating evidence against the petitioner and his brother, David. Moreover, the defense was able to significantly impeach Griffin by showing that he had committed numerous thefts of vehicles for which he was not arrested. (N.T. 2/18/80, 1554–56, 1575,

1598; 3/13/80, 5162–63). He conceded that he was convicted on two occasions of committing burglary and larceny (N.T. 2/18/80, 1554–55) and that recently a criminal charge pending against him in Pike County had been dismissed. (N.T. 2/25/80, 2574). He confessed to taking controlled substances such as quaaludes and marijuana on a regular basis in the first half of 1978. Petitioner confessed that during the time he overheard the incriminating conversations with the defendants, it was possible he had smoked marijuana. (N.T. 2/18/80, 1569–70). He acknowledged that he had trouble remembering the exact words of the defendants and the dates when these conversations took place. (N.T. 2/25/80, 2571–72).

Allowing the jury to hear that the Commonwealth released Griffin with restrictions and paid him the total sum of $300, solely to protect him from harm from the defendants, would not have seriously cast into doubt Griffin's testimony. On the contrary, it would have prejudiced the petitioner and his co-defendant. *See United States v. Adams,* 785 F.2d 917, 921 (11th Cir.), *cert. denied,* 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 706 (1986) (failure to disclose promise to place witness in witness protection program was not error since defense counsel "hardly would have elected to reveal the promise in front of the jury, because such revelation would have disclosed the threats made against the witness"). Indeed, at the time Griffin testified, the defense knew he was in the federal witness program, but chose not to cross-examine him about this fact. (N.T. 2/18/80, 1593).

In sum, considering Griffin's testimony as a whole, and the other evidence, the judg-

ment of the jury could not have been affected by the decision to release Griffin from prison for his safety. *See Breest v. Perrin,* 624 F.2d 1112, 1115 (1st Cir.) *cert. denied,* 449 U.S. 1020, 101 S.Ct. 585, 66 L.Ed.2d 481 (1980) (writ of habeas corpus denied on claim that prosecution failed to disclose that key government witness had been given assurance of safety, including a new name, location, and haircut, in exchange for his testimony).

## 5. Federal Immunity Agreement

On or about August 8, 1979, James Griffin entered into an informal immunity agreement with the United States Department of Justice. (N.T. 5/26/87, 31). Griffin was also cooperating with the United States Attorney's office for the Eastern District of Pennsylvania and the Federal Bureau of Investigation in the investigation of the petitioner, David Johnston and Bruce Johnston, Sr. and other members of their organization.[10] The Memorandum of Understanding required Griffin to "provide truthful testimony" regarding thefts of tractors and trucks and "obstructions of federal witnesses and potential federal witnesses, including the murder or attempted murder of such witnesses." (Exhibit D–4, ¶ 2). In exchange for this testimony, the federal government granted Griffin "use-immunity"; that is, anything said by Griffin would "not be used directly or indirectly against him in any federal prosecution." The parties acknowledged that the agreement was "not intended to, and does not, in any way influence or limit the prosecutive discretion of any state or local authority."[11] (Exhibit D–4, ¶ 6).

Defense counsel did not learn of the existence of the immunity agreement until after

---

**10.** The record contains two immunity agreements, one in the form of a letter dated August 8, 1979 (Exhibit D–4) and another undated document (Exhibits D–5 and D–5A) (N.T. 5/26/87, 30–37). The Assistant United States Attorney who executed the informal immunity agreement testified that he could not explain why there were two agreements, but he did state that they both accurately reflect the agreement with Griffin. (N.T. 6/10/87, 104–05). Exhibit D–5A was signed by Mr. Griffin and his attorney as well as the attorneys for the government. Exhibit D–4 was signed by the government attorneys and Griffin's counsel, but not by Griffin.

**11.** Counsel for Griffin understood that the terms of the informal immunity agreement did *not* prohibit state authorities from using Griffin's federal testimony directly against him in a state prosecution. (N.T. 5/26/87, 104, 184–85). The Memorandum of Understanding was not a statutory grant of immunity, approved by the court, as provided by 18 U.S.C. §§ 6002–6003. (N.T. 6/10/87, 98). Unlike the informal immunity agreement at issue here, "the statutory bar against use or derivative use of immunized testimony applies equally to federal and state proceedings." *In re Grand Jury Proceedings,* 860 F.2d 11, 14 (2d Cir.1988).

the petitioner's trial. Petitioner alleges that his due process rights were violated by the failure to disclose this agreement. During the post-trial evidentiary hearings, the prosecutors and police investigators employed by the Commonwealth all testified that they were not aware of the existence of the federal immunity agreement until long after the conclusion of the petitioner's trial. (N.T. 5/27/87, 171–73, 208–09, 230–31; 6/10/87, 21–22, 26–27, 71).

The Commonwealth apparently concedes that had it actually known of the existence of the immunity agreement, it was required to disclose it prior to Griffin's testimony. *See United States v. Pflaumer,* 774 F.2d 1224, 1226 (3d Cir.1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986) (prosecutor's failure to disclose immunity agreement may lead to subversion of defendant's due process rights). However, the state argues that since Judge Sugerman found that state officials did not know of the agreement, there cannot be a *Giglio* violation.

The petitioner contends that since the federal officials, who granted the immunity, were part of the joint prosecution team with the state officials, the Commonwealth officials should be deemed to have constructive knowledge of the immunity agreement, and cannot escape their *Giglio* obligations by pleading lack of actual knowledge.[12]

The principle of constructive knowledge as it applies to exculpatory evidence was first discussed by the Supreme Court in *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). There, the Court held that the government had a duty to disclose an agreement made by an Assistant United States Attorney not to prosecute a government witness, even though the deal was not known to another prosecutor who tried the case and was in the same office. Citing the Restatement (Second) of Agency § 272, the Court held that "[a] promise made by one attorney must be attributed, for these purposes, to the Government." *Id.* at 154, 92 S.Ct. at 766. Chief Justice Burger stated that "whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor." *Id.*

In *United States v. Antone,* 603 F.2d 566 (5th Cir.1979), the court addressed the question of when knowledge of a state agent can be imputed to a federal prosecutor. In *Antone,* the key government witness had his attorney fees paid for by state authorities. This payment was unknown to the Assistant United States Attorney prosecuting the case, but was known to state investigators working with the federal officials on this prosecution. After the defendant was convicted in federal court, the defense learned that this witness had lied at trial when he stated he paid his own attorney fees. In response to a motion for a new trial based on newly discovered evidence, the government argued that it could not be held responsible for disclosure of the attorney fee arrangement since it had no actual knowledge of this at the time of the trial. The defense countered that state investigators assigned to the federal prosecution team knew of the payment arrangement and, thus, the federal prosecutor should be

12. The trial court did not make a factual finding that Assistant United States Attorney Richardson and FBI Agent Richter were part of the joint federal-state prosecutor team. (Oral argument on David Johnston's Petition for Writ of Habeas Corpus N.T. 11/29/94, 46). This court has assumed, for purposes of the petitioner's argument, that there was a joint federal-state effort to investigate and prosecute the Johnston gang for the murders. The record does support this conclusion. First, the defendants committed the murders to prevent witnesses from cooperating in a federal grand jury investigation. Thus, the federal government had a great interest in the successful murder prosecution of the defendants in state court. Although no formal "task force" was established, all participants in the investigation considered it a joint federal-state effort.

FBI Agent Richter worked "in cooperation" with the state investigators and did assist them. (N.T. 5/27/87, 133, 215, 228–29; 6/10/87, 95–96, 118, 130). There was a free exchange of information between the federal and state investigators. (N.T. 6/10/87, 130). While Richter exchanged much with state investigators, AUSA Richardson had little contact with them. (N.T. 6/10/87, 95–96). Agent Richter was present during some of the debriefings of James Griffin, but did not attend the sessions when Griffin was prepared for his trial testimony. (N.T. 5/27/87, 109–10, 228; 6/10/87, 121). Both Richter and Richardson attended the state murder trial at which they were called as witnesses. Both, however, were sequestered during the prosecution's case. (N.T. 2/8/80, 127–28, 153).

deemed to have constructive knowledge of the attorney fee agreement.

The court in *Antone* noted that there were no cases in which a court imputed knowledge of an agent for the state to the federal government where federal and state investigations overlap. However, the court rejected making a "rigid distinction" between federal and state agencies "which have cooperated intimately from the outset of an investigation." *Id.* at 570. The court held that an analysis should be made on a case-by-case basis to determine the extent of interaction and cooperation between the two governments. Applying agency principles discussed in *Giglio*, the court concluded that the state agents were members of the prosecutorial team, and as such were "agents of the federal government." Thus, the court held that knowledge of the state team that the witness' lawyer was paid from state funds was imputed to the federal team. 603 F.2d at 569.

This approach of the Fifth Circuit in *Antone* was specifically adopted by the Third Circuit in *United States v. Perdomo*, 929 F.2d 967 (3d Cir.1991). There, the court held that an inquiry into a prosecutor's knowledge of *Brady* or *Giglio* material "need not stop at the prosecutor himself" but should also extend to investigators working with him. Judge Higginbotham wrote: "We agree that a court's inquiry should not be limited to only the prosecutor's complicity and adopt the Fifth Circuit's approach." *Id.* at 970. In *United States v. Joseph*, 996 F.2d 36 (3d Cir.), *cert. denied*, 510 U.S. 937, 114 S.Ct. 357, 126 L.Ed.2d 321 (1993), the court, citing *Perdomo*, again held that a prosecutor can be considered to have constructive, as opposed to actual, knowledge of *Brady* or *Giglio* material under certain circumstances which would trigger his or her obligation to

disclose the information to the defense. *Id.* at 40.[13]

The petitioner interprets these cases to mean that once the court finds Assistant United States Attorney Douglas Richardson and FBI Agent Norman Richter were part of the "joint federal-state prosecution team," it must impute their knowledge to the Commonwealth. This court disagrees. The inquiry must go further. The court must apply the agency principles of *Giglio*, and determine whether Assistant United States Attorney Richardson or Agent Richter were acting as the agents for the Commonwealth or the joint prosecution team when they made the immunity agreement with Griffin.

The Restatement (Second) of Agency, Section 272, cited by *Giglio*, states: "[T]he liability of a principal is affected by the knowledge of an agent concerning a matter as to which he acts within his power to bind the principal or upon which it is his duty to give the principal information." The agent and principal relationship is created by conduct of two parties demonstrating that one party consents to have another act on its behalf, and the agent agrees to be subject to the control and direction of the principal. However, the principal must indicate, in some manner, "that the agent is to act for him, and the agent must act or agree to act on the principal's behalf and subject to his control." Restatement (Second) Agency § 1, Comment a (1958); *American Telephone and Telegraph Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1434 (3d Cir.1994).

Here, Assistant United States Attorney Richardson was not acting as an agent for the Commonwealth or the "joint-prosecution" team when he granted an informal grant of immunity to Griffin. Richardson testified that the immunity was given specifically to

---

**13.** In *Joseph*, the court held that where the exculpatory information is contained in a file "unrelated to the case under prosecution," constructive knowledge will be imputed to the prosecutor only when the defense has made a specific request for the information; a general request for *Brady* material will not suffice. 996 F.2d at 40–41. *See also United States v. Veksler*, 62 F.3d 544, 550 (3d Cir.1995). Here, it does not appear that petitioner made a specific request for a federal immunity agreement for James Griffin,

but only a general request for exculpatory evidence. Petition, Exhibit P–2. Since it may be argued that the federal government's grant to Griffin of informal immunity was "related to" the state's murder investigation (*see infra* note 14), the court will consider petitioner's constructive knowledge argument, even though he did not specifically request the Commonwealth to produce any immunity agreements with James Griffin.

provide protection to Griffin during his testimony in the federal trial of *United States v. Thomas Rebert.* (N.T. 5/27/87, 33; 6/10/87, 199–01). Rebert was a resident of Delaware County, and Chester County authorities did not participate in this particular federal prosecution. (N.T. 6/10/87, 100–01, 122, 129). Richardson did not consult or obtain the consent of the state authorities to the immunity agreement. (N.T. 6/10/87, 101). In fact, several months earlier, Assistant United States Attorney Richardson and his superior, United States Attorney Peter Vaira, assured Assistant District Attorney Troiani that the federal government would not immunize Griffin after Ms. Troiani objected to such an agreement. (N.T. 5/27/87, 115–116, 119, 121). In an apparent effort to placate the state prosecutor's concerns, attorneys for the federal government and Griffin explicitly agreed that the immunity agreement would not be binding on the state authorities. (Exhibit D–4).[14]

In view of the above facts, the court cannot find that the Commonwealth, through Ms. Troiani or anyone else, consented to having Richardson act as the Commonwealth's agent when he entered into the immunity agreement. On the contrary, Assistant District Attorney Troiani explicitly did not consent to the immunity agreement and did not exert any control over the federal authorities. Thus, agency principles cannot be used to impute to the state authorities constructive knowledge of the immunity agreement. Even if FBI Agent Richter and Assistant United States Attorney Richardson could, for some purposes, be considered "agents" of the Commonwealth prosecution team, they clearly did not have the power or authority to bind the Commonwealth to the federal immunity agreement, after Assistant District Attorney Troiani opposed the immunity agreement.[15]

The facts of this case are clearly distinguishable from the two cases where the courts have imputed knowledge of a state agent of *Brady* material to a federal prosecutor.[16] In *United States v. Antone,* a joint investigative task force composed of FBI agents and Florida state officers was formed to solve a murder of a police officer. One state officer, who was a member of the joint prosecution team, arranged for the state to pay the attorney fees of a key government witness. He volunteered to take care of the problem of obtaining an attorney for the witness *during a joint meeting* of the members of the team. 603 F.2d at 569. The federal members of the team did not object to the state officer's effort to obtain an attorney for the crucial witness. Given these

14. In the immunity agreement, Griffin agreed to assist the federal investigation. The terms of the written agreement, however, were not limited just to testimony relating to Thomas Rebert. In addition to Rebert, the agreement listed 18 other individuals who were subject to the federal investigation, including petitioner and his brothers. The agreement also required Griffin to provide information regarding the murders of federal witnesses. (Exhibits D–4, D–5, D–5A). Prosecutor Troiani had objected to any immunity agreement which "covered the homicides." (N.T. 5/27/87, 115). In response, United States Attorney Vaira assured Troiani that he "would never do anything which would in any way interfere with" the murder prosecutions, and that his office would not "proceed" with the immunity agreement. (N.T. 5/27/87, 119).

The record does not provide a complete explanation as to why the federal authorities executed the immunity agreement over the protest of state authorities, or why the agreement included protection for testimony regarding the murders. AUSA Richardson's testimony did touch upon these questions. He testified that the immunity agreement was executed upon the request of Griffin's counsel to protect his client during his testimony in the *Rebert* case, and the reason for listing the 19 targets of the federal investigation in the agreement was "to suggest to Mr. Griffin and to his counsel how broad our information was about the operations of all of the things [of] which he had knowledge." (N.T. 6/10/87, 100–01). AUSA Richardson maintained that the Commonwealth's investigation of the Johnston brothers for murder was not "a factor" for including testimony regarding the murders, or the Johnston brothers, in the immunity agreement. (N.T. 6/10/87, 101).

15. Restatement (Second) Agency § 6 defines "power" as the "ability on the part of a person to produce a change in a given legal relation by doing or not doing a given act." Section 7 of the Restatement defines "authority" as "the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him."

16. The court has found no case where knowledge of a federal agent or prosecutor was imputed to a state prosecutor.

facts, the *Antone* court found that the state officer's payment of the attorney fees would be imputed to the federal authorities who were members of the joint prosecution team. In contrast to the *Antone* case, the federal immunity agreement at issue here was entered into specifically so the witness could testify in a federal trial, in which the state authorities did not participate. The state prosecutors and officers were unaware of the immunity agreement, and when it was discussed in the presence of one of the state prosecutors, she specifically objected to it.

In *United States v. Mannarino*, 850 F.Supp. 57 (D.Mass.1994), the court held that a state agent's destruction of his notes of an interview with a key government witness which was required to be disclosed to the defense under the Jencks Act, 18 U.S.C. § 3500, would be imputed to federal prosecutors, even though they did not have actual knowledge of the existence or destruction of the notes. The court reasoned that the state agent was part of a joint federal-state task force under the control of the federal Drug Enforcement Administration ("DEA"); that he was instructed by a DEA agent not to destroy his notes; and the DEA placed the state agent "in charge" of the witness' "overall cooperation." 850 F.Supp. at 61.

In the case at bar, Assistant United States Attorney Richardson and FBI Agent Richter were not "in charge" of Mr. Griffin's cooperation with the authorities relating to the multiple murders. If anything, the state had more control over Griffin, since they had lodged the conspiracy to commit murder charge against him, and initially maintained protective custody of him. (N.T. 5/27/87, 201–02; 6/10/87, 135). Furthermore, the state did not control or give direction to Agent Richter or Assistant United States Attorney Richardson, as was the case of a state agent in *Mannarino* who was assigned to a task force under the control of the DEA.

Although the Third Circuit has recognized the doctrine of constructive knowledge of *Brady* material, it has only applied it once in the "unique circumstances" of the *Perdomo*

case. *See United States v. Joseph,* 996 F.2d at 40.[17] In this case, this court finds that it would stretch the constructive knowledge doctrine too far to find that the Commonwealth should be held to know of a federal immunity agreement made for a specific federal case, when it objected to granting a federal immunity agreement to Griffin. *See United States v. Gambino,* 835 F.Supp. 74, 95 (E.D.N.Y.1993), *aff'd,* 59 F.3d 353 (2d Cir.1995) (refusing to extend doctrine to impute to a federal prosecutor an FBI agent's and state prosecutor's knowledge of *Brady* material obtained in an investigation other than one which led to charges against defendant). Accordingly, the court holds that there was no *Giglio* violation because of the failure to disclose the federal immunity agreement to the defense.

In any event, disclosure of the federal immunity agreement (together with the modification of Griffin's bail conditions) would not have reasonably affected the outcome of the trial. The immunity agreement did not prevent the state from prosecuting Griffin for the conspiracy to commit murder, or for the numerous thefts which he committed. Thus, it could not be argued by the defense that the immunity agreement provided Griffin with a compelling motive to testify for the Commonwealth in the murder cases. Furthermore, as stated above, the defense already was able to effectively impeach Griffin. Cross-examination on the federal agreement would not add much to the attack on Griffin's credibility. *See United States v. Pflaumer,* 774 F.2d at 1230 (failure to disclose immunity agreement of government witness did not warrant new trial. because no reasonable probability existed that the result of trial would have been different).

## C. Exclusion of Testimony of Graham Andes, Esq.

Richard Mitchell was an important witness for the Commonwealth during petitioner's trial. Mitchell was a member of Bruce Johnston Sr.'s burglary gang. He testified that, on August 16, 1978, he witnessed Bruce

---

**17.** In *United States v. Perdomo,* the court held that a Virgin Island prosecutor should have known of a witness' criminal record because the

information was "readily available" to him in that it was contained in local Virgin Island records which the prosecutor failed to search.

Johnston, Sr. shoot James Johnston and afterwards, caused Johnston to be placed in a grave which Mitchell and petitioner had dug earlier. He later observed David Johnston shoot and kill Dwayne Lincoln. Lincoln was buried with James Johnston. Finally, Mitchell testified that he shot and killed Wayne Sampson and helped bury him in the hole, along with James Johnston and Dwayne Lincoln. (N.T. 2/12/80, 617–19; 2/21/80, 2321–25, 2285–300). Mitchell testified that, at a later time, and at a different location, he witnessed petitioner shoot and kill James Sampson, and that Sampson was buried in a landfill. (N.T. 2/12/80, 621–22). Finally, Mitchell gave a detailed account of the conspiracy among himself, Bruce Johnston, Sr., David Johnston and the petitioner to kill Bruce, Jr. and his girlfriend, Robin Miller. He testified that he overheard conversations between David Johnston and petitioner where both admitted that they shot and killed Robin Miller, and they attempted to murder Bruce, Jr. (N.T. 2/12/80, 695–705).

In an attempt to impeach Mitchell, petitioner wished to present the testimony of Graham Andes, Esquire, who had represented Mitchell in 1975. According to petitioner's offer of proof, Andes would have testified that Mitchell, in order to obtain favorable treatment from the police in 1975, made a false statement to authorities that petitioner's brothers, Bruce Johnston, Sr. and David Johnston, had killed a man named Kenny Howell. However, at the time the representation was allegedly made, Kenny Howell was alive. (N.T. 2/29/80, 3689–93). The purpose of Mr. Andes' testimony would have been to show that Mitchell was generally incredible, and that Mitchell had a practice of falsely attributing criminal conduct to the Johnston brothers in order to curry favor with the authorities.

Judge Sugerman ruled the evidence was inadmissible for two reasons. See Commonwealth v. Johnston, Crim. No. 037779, slip op. at 134–37. First, if allowed to testify, Mr. Andes would state that Mitchell told him that Bruce and Norman Johnston told Mitchell that they had killed Kenny Howell. (N.T. 2/29/80, 3689–93). Mitchell did not say that he possessed independent knowledge

that the two had in fact killed Howell. (N.T. 2/13/80, 779–80). Judge Sugerman ruled that the proffered testimony was not probative of Mitchell's veracity, since it showed only that Bruce and Norman Johnston had provided false information to Mitchell, not that the latter was himself fabricating a story. Commonwealth v. Johnston, Crim. No. 037779, slip op. at 134–35.

Second, Judge Sugerman held that the allegedly false statements were not admissible as a matter of state law. Id. at 136–37. Under Pennsylvania law, the veracity of a witness may be attacked only through showing evidence indicating a bad reputation for truth and veracity in the community in which the witness resides, not through specific instances of dishonesty, as is permitted by Federal Rule of Evidence 608. Commonwealth v. Smith, 240 Pa.Super. 212, 217, 361 A.2d 862, 865 (1976), rev'd on other grounds, 477 Pa. 424, 383 A.2d 1280 (1978); Commonwealth v. Hansell, 185 Pa.Super. 443, 446, 137 A.2d 816, 818 (1958).

▉ State court rulings on the admissibility of evidence rarely will serve as a ground for granting a writ of habeas corpus. They cannot be grounds for granting relief unless it is shown that a specific constitutional right has been violated or when the state evidentiary ruling violates petitioner's due process right to a fundamentally fair trial. Crane v. Kentucky, 476 U.S. 683, 689–90, 106 S.Ct. 2142, 2146–47, 90 L.Ed.2d 636 (1986); Kontakis v. Beyer, 19 F.3d 110, 119–20 (3d Cir.), cert. denied sub nom., Kontakis v. Morton, —— U.S. ——, 115 S.Ct. 215, 130 L.Ed.2d 143 (1994); Lilly v. Gilmore, 988 F.2d 783, 789 (7th Cir.), cert. denied, 510 U.S. 852, 114 S.Ct. 154, 126 L.Ed.2d 116 (1993).

▉ Petitioner argues that the exclusion of the testimony of Mr. Andes violates the Compulsory Process Clause of the Sixth Amendment which guarantees criminal defendants the right to present witnesses in his own defense. See Taylor v. Illinois, 484 U.S. 400, 408, 108 S.Ct. 646, 652, 98 L.Ed.2d 798 (1988). This right, however, is not absolute. "The accused does not have an unfettered right to offer testimony that is incompetent, privileged or otherwise inadmissible under standard rules of evidence." Id. at 410, 108

S.Ct. at 653. To determine whether the exclusion of the evidence in question violated the petitioner's constitutional rights, the court must examine whether the proffered evidence was relevant, material, and vital to the defense, and whether the exclusion of the evidence was arbitrary. *Washington v. Texas,* 388 U.S. 14, 16–17, 87 S.Ct. 1920, 1921–22, 18 L.Ed.2d 1019 (1967); *Lilly v. Gilmore,* 988 F.2d at 789.

Judge Sugerman did not act arbitrarily in excluding the testimony of Mr. Andes. The ruling was based on Pennsylvania's law of evidence. More importantly, the proffered testimony of Mr. Andes that Mitchell told him that *he was told* by Bruce and Norman Johnston that they murdered Howell was not relevant in that it was not probative of Mitchell's veracity. Because the evidence was not probative of Mitchell's credibility, it was irrelevant and immaterial, and not vital to his defense. Thus, the exclusion of the evidence did not violate the Compulsory Process Clause of the Sixth Amendment. The claim for habeas corpus relief on this ground must be denied.

### D. Evidence of Prior Bad Acts

Petitioner alleges that he was deprived of his right to a fair trial because the prosecution on several occasions elicited testimony regarding petitioner's prior criminal activity for which he was not on trial and his attempts to flee from criminal charges. Petitioner cites five examples of direct or cross-examination by the Commonwealth that elicited such evidence. The evidence was admitted to show petitioner's motive to murder the four witnesses and his consciousness of guilt.

As stated previously, state court rulings on the admissibility of evidence rarely will serve as a ground for granting a writ of habeas corpus. *Crane v. Kentucky,* 476 U.S. at 689–90, 106 S.Ct. at 2146–47. "Thus, a federal court cannot disturb on due process grounds a state court's decision to admit prior bad acts evidence unless the admission of the evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair." *Walters v. Maass,* 45 F.3d 1355, 1357 (9th Cir.1995).

Here, the trial court's decision to admit the evidence was neither arbitrary nor did it deprive the defendant of a fundamentally fair trial guaranteed by due process. Most of the evidence of the past criminal activities of the petitioner and his brother was admitted to show their motive for killing four potential witnesses who were providing information to law enforcement officials about their unlawful activities. Such evidence is clearly admissible. *See Commonwealth v. Duffey,* 519 Pa. 348, 367, 548 A.2d 1178, 1187 (1988). In order that the jury may assess the intensity of petitioner's motive to silence potential witnesses, it had to know the extent of the petitioner's involvement in the criminal activities that were the subject of the federal grand jury's investigation. Likewise, evidence of attempted flight from criminal charges directly related to the case on trial is relevant to show consciousness of guilt. *United States v. Bamberger,* 456 F.2d 1119, 1126 (3d Cir.1972), *cert. denied,* 413 U.S. 919, 93 S.Ct. 3067, 37 L.Ed.2d 1040 (1973); *Commonwealth v. Gorby,* 527 Pa. 98, 112–13, 588 A.2d 902, 909 (1991). While there is always a danger that the jury may convict a defendant for uncharged criminal conduct, this risk can be minimized by cautionary instructions by the trial judge, which were given here in ample measure by Judge Sugerman. (N.T. 3/14/80, 5422–24).

While the petitioner is correct that evidence of his prior bad acts may have given the jury the impression that he was a man of bad character, this fact alone does not prevent the introduction of otherwise probative evidence. As noted by one eminent jurist, the law "does not demand exclusion of highly probative evidence simply to prevent noisome odors about the defendant from reaching the jury's nostrils." *United States v. Bradwell,* 388 F.2d 619, 622 (2d Cir.) (Friendly, J.), *cert. denied,* 393 U.S. 867, 89 S.Ct. 152, 21 L.Ed.2d 135 (1968). Here, the trial judge properly found that the probative nature of the prior crimes' evidence outweighed any prejudice to the petitioner. Accordingly, this court finds that petitioner's claim that he was denied a fair trial by the admission of the prior crimes' evidence is without merit.

### E. Prejudice by Conduct of the Trial Judge

Petitioner claims that he was prejudiced by the conduct of the trial judge during the testimony of one of the Commonwealth's witnesses, Richard Falasco. Mr. Falasco testified that prior to the trial, he was incarcerated at Chester County Prison with petitioner. He testified to participating in a conversation between himself, petitioner, and an investigator, Frank Judge, who was hired by petitioner's trial attorney, Lawrence Goldberg, Esquire. Mr. Falasco testified that during this conversation, Mr. Judge asked him to provide false testimony to the court regarding the petitioner. (N.T. 2/29/80, 3510–16). Allegedly, trial counsel for petitioner was present during the conversation but seated some 25 feet away from the other three persons. (N.T. 2/29/80, 3510–16).

Petitioner argues that the trial judge exhibited bias against him and his attorney by unnecessarily staring at petitioner's counsel during Mr. Falasco's testimony when he alleged that Mr. Judge requested him to present false testimony on behalf of petitioner. He argues that the jury may have interpreted the alleged staring as the trial judge's endorsement of the truthfulness of Falasco's testimony and as a negative statement with respect to petitioner's counsel.

■ The federal court's power to review the conduct of a state trial court is limited to whether a defendant's right to due process of law has been violated. *Perry*, 584 F.2d at 645. Although not specifically framed as such by petitioner, petitioner's claim that the trial judge was biased raises the issue of due process. "A state trial judge's conduct would have to be significantly adverse to defendant before it violated the constitutional requirement of due process and warranted federal intervention." *Garcia*, 795 F.2d at 8. It is true, that "the judge who is so hostile to a lawyer as to doom the client to defeat deprives the client of the right to an impartial tribunal." *Walberg v. Israel*, 766 F.2d 1071, 1077 (7th Cir.1985). However, to obtain habeas corpus relief, a petitioner must show that he was in fact treated unfairly by the judge—the "appearance" of bias is not enough. As has been stated by one court:

A litigant is denied the fundamental fairness to which he is constitutionally entitled if the judge of his case is unfairly biased against him. However, a litigant is not denied due process by whether the "appearance" of partiality or by circumstances which might lead one to speculate as to a judge's impartiality. A litigant is denied due process if he is in fact treated unfairly.

*Margoles v. Johns*, 660 F.2d 291, 296 (7th Cir.1981), *cert. denied*, 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982). The same court stated that the "Supreme Court has never rested the vaulted principle of due process on something as subjective and transitory as appearance." *Del Vecchio v. Illinois Dept. of Corrections*, 31 F.3d 1363, 1371–72 (7th Cir.1994) (*en banc*), *cert. denied*, — U.S. —, 115 S.Ct. 1404, 131 L.Ed.2d 290 (1995). Our court of appeals also held that the "appearance of bias" does not necessarily deprive petitioner of his constitutional right to a fair and impartial trial. *Perry*, 584 F.2d at 645. *See also United States v. Wilensky*, 757 F.2d 594, 598 (3d Cir.1985) ("[a]lthough a few isolated, allegedly prejudicial comments by the trial judge are not sufficient to warrant a reversal, a balancing process must be employed to determine whether the trial judge's comments have pervaded the overall fairness of the proceeding").

Here, petitioner has not shown that the trial judge treated him unfairly. At an evidentiary hearing held in 1982, petitioner failed to show that the judge mistreated him or his counsel. The transcript of the hearing, as well as the trial record, shows that, at the time of Mr. Falasco's testimony, Judge Sugerman's conduct in peering over the top of his glasses at the litigants was a characteristic aspect of his demeanor, and not something particularly directed at counsel for the petitioner. (N.T. 7/7/82, 6–7; 7/8/82, 146–58). There is nothing in the record to support petitioner's assertion that the jury construed Judge Sugerman's glaring at trial counsel to be his endorsement of the veracity of Falasco's testimony. Indeed, in his closing instructions to the jury, the trial judge told the jury that, "you are not bound by and should in fact ignore any opinion you might think I

have expressed concerning ... the credibility of any or all of the witnesses, the weight of evidence, the facts proven by the evidence, or any inferences to be drawn from those facts. Those matters are for your determination alone—yours and yours alone." (N.T. 3/14/80, 5366). Thus, petitioner is entitled to no relief on the ground of the alleged bias of the trial judge.

## F. Ineffective Counsel

Petitioner alleges that his trial counsel was ineffective on five occasions during the trial.

The Sixth Amendment bestows upon criminal defendants the right to effective trial counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). Nevertheless, the petitioner here bears a heavy burden when attempting to establish that his counsel was ineffective. He must show (1) that his attorney's representation fell below an objective standard of reasonableness; and (2) that there exists a reasonable possibility that, but for counsel's ineffectiveness, the result of the proceeding would have been different. *Id.* at 688–96, 104 S.Ct. at 2064–69. In a habeas corpus proceeding, the state court's conclusion that counsel was not ineffective is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d). However, "state court findings of fact made in the course of deciding an ineffectiveness claim" are subject to the deference requirement of § 2254(d). *Id.* at 698, 104 S.Ct. at 2070.

### 1. Failure to Ask for Mistrial During Testimony of Richard Falasco

As recounted earlier, petitioner argues that the trial judge exhibited bias against him and his attorney by unnecessarily staring at petitioner's counsel during Mr. Falasco's testimony when he stated that he was requested by counsel's investigator to present false testimony on behalf of the petitioner. He argues that trial counsel should have moved for a mistrial or requested a cautionary instruction since the jury may have construed the judge's actions as an endorsement of the truthfulness of Mr. Falasco's testimony and a rebuke of petitioner's counsel.

.At the evidentiary hearing held before the state court on petitioner's ineffective counsel claims, the following facts were established: First, that during the trial, Mr. Falasco repeatedly testified that Mr. Goldberg was in *no way* involved in suborning perjury, and that he lied to trial counsel when he gave his false statement to the trial court. (N.T. 2/29/80, 3579–605, 3651). Second, that while Mr. Goldberg became "angry" when he heard Mr. Falasco's testimony, such reaction had no effect whatever upon his performance as counsel. (N.T. 7/7/82, 6–9). Finally, trial counsel testified that at the time of Mr. Falasco's testimony, he did not believe that the Commonwealth had a "very strong case" against the petitioner and that he believed he could show the jury that Mr. Falasco was a liar. Counsel therefore reasoned that he would be in a better position proceeding with the trial, than requesting a mistrial. (N.T. 5/25/82, 237–38; 7/7/82, 3–5).

In evaluating an ineffective assistance of counsel claim, this court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. The Supreme Court has stated that "judicial scrutiny of counsel's performance is to be highly deferential." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. This court finds that trial counsel's explanation for his reason for declining to move for a mistrial was reasonable. As explained earlier, this court can find nothing in the trial judge's actions from which the jury could infer that the judge questioned the integrity of counsel or endorsed the veracity of Mr. Falasco's testimony. Since up to the time of Mr. Falasco's testimony, the evidence against the petitioner was not "very strong", counsel acted reasonably in not moving for a mistrial which would, perhaps, give the Commonwealth another opportunity to make a weightier case against the petitioner. Likewise, a cautionary instruction regarding Falasco's testimony may have done more harm than good. Such an instruction would focus the jury's attention on damning evidence which may have been overlooked or forgotten. *See United States v. Myers*, 917 F.2d 1008, 1010–11 (7th Cir.1990) (court concluded that counsel acted reasonably in not requesting a cautionary instruction stating that "rea-

sonable persons may differ about whether the good such an instruction does with a thoughtful juror will outweigh the harm it can do by fastening attention on a link that may have been overlooked or forgotten.") Moreover, petitioner has not shown that the outcome of the trial would have been different if trial counsel requested a limiting instruction.

### 2. Trial Counsel's Failure to Request Permission to Testify

Petitioner testifies that his counsel was ineffective for failing to request permission to testify to rebut any inference from Richard Falasco's testimony that counsel was suborning perjury.

Trial counsel, Lawrence Goldberg, did, at one time, request permission to testify to rebut the assertions of Falasco. (N.T. 3/8/80, 3818). The court deferred ruling on this matter. However, at no time thereafter did trial counsel ask to testify. During a post trial hearing on the matter, trial counsel explained that after talking to counsel for co-defendant, David Johnston, both counsel came to the conclusion "that it would not be wise" for counsel to testify and "further bring up the issue which [both counsel] had worked over pretty heavily." (N.T. 7/7/82, 42–3). This court finds that Mr. Goldberg's decision, which was supported by his co-counsel, was a reasonable and competent one. As stated earlier, Mr. Falasco repeatedly testified that Mr. Goldberg was in *no way* involved in suborning perjury. (N.T. 2/29/80, 3579–605, 3651). Both defense counsel agreed that they had seriously put into question the credibility of Mr. Falasco, who at the time was incarcerated in prison. It was therefore "wise" for counsel to leave well enough alone and not to again highlight Mr. Falasco's testimony by taking the unusual step of calling trial counsel as a witness. *See United States v. Walters,* 904 F.2d 765, 772 (1st Cir.1990) (counsel not ineffective for failing to take action which would only have emphasized damning evidence against defendant). Accordingly, this claim of ineffective counsel is without merit.

### 3. Trial Counsel's Failure to Object to Testimony Regarding a Contract on the Life of Richard Mitchell

Petitioner argues that his trial counsel was ineffective for failing to object to testimony about petitioner having a "contract" on the life of Mr. Mitchell. Petitioner further complains that his counsel was ineffective for failing to request a cautionary instruction regarding the "contract".

This claim of ineffective counsel is without merit for two reasons. First, petitioner's counsel had no grounds on which to object to the testimony. Testimony regarding the contract was first elicited at the trial by petitioner's counsel during his redirect of Mr. Mitchell (N.T. 2/13/80, 832–33), and his cross-examination of Chief Zagorskie (N.T. 2/22/80, 2495–96). Petitioner's counsel, not the Commonwealth, opened the door and invited the testimony which he now claims is error. Petitioner's counsel had no grounds on which to object to the Commonwealth's exploration of this testimony at the trial. *See Commonwealth v. Lewis,* 472 Pa. 235, 240, 372 A.2d 399, 401 (1977). *See also Commonwealth v. Sheaff,* 365 Pa.Super. 613, 620, 530 A.2d 480, 483 (1987) ("If a defendant delves into what would be objectionable testimony on the part of the Commonwealth, the Commonwealth can probe further into the objectionable area.")

Second, the testimony regarding the "contract" was relevant and admissible. The petitioner does not argue that his counsel was ineffective because of his questioning of Mr. Mitchell and Chief Zagorskie about the contract. Petitioner's counsel effectively cross-examined Mitchell and impeached his credibility. He attempted to establish as a motive for Mitchell's testimony that Mitchell was himself avoiding trial for the murders of which petitioner was accused. Petitioner should not be at all surprised that the Commonwealth *sought to show during its redirect* examination that Mitchell had a different motive for testifying; i.e., petitioner had a contract on his life. Again, petitioner's counsel would not have succeeded on objections to this testimony at trial. Counsel cannot be faulted for failing to pursue meritless or futile objections. *See Bolender v. Singletary,*

16 F.3d 1547, 1573 (11th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 589, 130 L.Ed.2d 502 (1994) (failure to raise non-meritorious issues does not constitute ineffective assistance of counsel); *Thomas v. United States*, 951 F.2d 902, 904 (8th Cir.1991) (defense counsel not ineffective for failing to raise meritless objections); *United States v. Lawson*, 947 F.2d 849, 853 (7th Cir.1991), *cert. denied*, 503 U.S. 948, 112 S.Ct. 1505, 117 L.Ed.2d 643 (1992) (same). Furthermore, a cautionary instruction on this evidence would focus the jury's attention on this damaging evidence and would highlight Mitchell's testimony. Accordingly, it was reasonable for counsel not to seek such a limiting instruction. *See Myers*, 917 F.2d at 1010–11; *Williams v. Armontrout*, 912 F.2d 924, 934 (8th Cir.1990), *cert. denied*, 498 U.S. 1127, 111 S.Ct. 1092, 112 L.Ed.2d 1197 (1991).

### 4. Trial Counsel's Failure to Object to Testimony of Richard Mitchell Implicating Petitioner in Other Murders

Petitioner argues that his trial counsel was ineffective for failing to object to testimony by Mr. Mitchell that petitioner and his brothers committed other murders for which they were not on trial and placed the bodies in a landfill. (N.T. 2/25/80, 2697–700). This testimony arose in the context of questions regarding the murder of James Sampson of which petitioner was accused. Mr. Mitchell testified that David Johnston stated that if Sampson's body was put in the landfill it "would not be found like the other guys that were put in the landfill". (N.T. 2/25/80, 2699–700). At a post trial hearing, petitioner testified that he warned his trial counsel what Mr. Mitchell was about to say and asked him to object. (N.T. 5/24/82, 12, 14).

Mr. Mitchell stated that petitioner's brother, *not* the petitioner, made the comment regarding the other bodies in the landfill. This statement was not prejudicial to petitioner as it did not implicate petitioner in the other murders. Further, Mr. Mitchell, as the only available eyewitness to some of the murders, was an essential witness for the Commonwealth. His credibility, therefore, was of crucial importance to the defense.

Petitioner's counsel attempted to portray Mr. Mitchell as a liar and perjurer and as confused and barely, if at all, mentally competent to testify. Indeed, the closing arguments of petitioner's counsel and his brother's counsel spanned 120 pages of transcript of which 33 pages were devoted to a combined attack on Mr. Mitchell's credibility. (N.T. 3/13/80, 5128–41, 5144–47, 5157–62, 5167–68, 5195, 5198, 5221–25). Counsel testified that petitioner told him that Mr. Mitchell would be confused regarding the number of bodies in the landfill and the number in the "Triple Homicide" grave. (N.T. 7/7/82, 26–8). Petitioner's counsel explained that he did not object to Mitchell's testimony because it was helpful to the defense in that it was "another example of Mitchell being inconsistent". (N.T. 7/7/82, 27).

This court finds that trial counsel's explanation for not objecting to this testimony was reasonable. Not objecting to Mr. Mitchell's testimony on this point was in furtherance of the defense's goal to impeach the witness' credibility. Accordingly, this claim of ineffective counsel is without merit.

### 5. Failure to Object to Prosecutor's Closing Argument

Petitioner argues that numerous comments of the prosecutor in the closing argument were improper and prejudicial and that his counsel was ineffective for failing to object or request a curative instruction.

A habeas review of a prosecutor's remarks in a state trial is a limited one. The question is not whether the remarks were undesirable or inappropriate. Rather, the court must determine whether the prosecutor's conduct, in the context of the trial as a whole, "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." *Ramseur v. Beyer*, 983 F.2d 1215, 1239 (3d Cir.1992) (*en banc*), *cert. denied*, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993) (quoting *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 3109, 97 L.Ed.2d 618 (1987)). Accordingly, in evaluating the closing remarks, "[i]t is essential to distinguish between ordinary trial error and that sort of egregious misconduct which amounts to a denial of constitutional due

process." *Id.* (quoting *United States ex rel. Perry v. Mulligan,* 544 F.2d 674, 678 (3d Cir.1976), *cert. denied,* 430 U.S. 972, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977)).

This court has reviewed the prosecutor's closing arguments and for the reasons set forth below, concludes that they were not improper under the circumstances. Thus, petitioner's trial counsel was not ineffective for not objecting to the comments. Furthermore, even assuming, *arguendo,* that the prosecutor's remarks were improper, the comments were not so egregious as to amount to a denial of petitioner's right to due process.

Petitioner argues that the prosecutor acted improperly and prejudiced him by stressing that petitioner had a "contract" on Richard Mitchell's life, and the plea agreement between him and the Commonwealth was approved by the courts. As explained earlier, evidence of the threat on Mr. Mitchell's life was relevant to show his reasons for cooperating with the prosecution. Since the evidence was properly admitted, it was not error for the prosecutor to refer to it during his summation. (N.T. 3/14/80, 5313). Likewise, the prosecutor's statement to the jury that plea bargaining has been approved by the Supreme Court of the United States and the Pennsylvania courts is correct. (N.T. 3/14/80, 5257). *See Santobello v. New York,* 404 U.S. 257, 260, 92 S.Ct. 495, 497, 30 L.Ed.2d 427 (1971) (plea bargaining "is an essential component of the administration of justice" and "is to be encouraged"). It was proper to tell the jury of the courts' approval of plea bargains to dispel the often popular belief that there is something wrong about the plea bargaining process. The prosecutor also was not wrong in informing the jury, that a plea bargain must be approved by the judge before a guilty plea is entered. (N.T. 3/14/80, 5257–258). *See* Pa.R.Crim.P. 319(b)(3). This court also sees nothing improper in noting that Mr. Mitchell was represented by an attorney when he entered into the plea agreement and that he was present in the courtroom when his client testified. (N.T. 3/14/80, 5257).

Petitioner also contends that his counsel should have objected when the district attor-ney referred to him and his co-defendants as "crooks", "burglars", "killers", that they belonged to a "family of crime", and are people who are constantly on the wrong side of the law. (N.T. 3/14/80, 5254–55, 5346–53). He also complains about remarks that petitioner had just beaten the police home after the ambush shooting of Bruce Johnston, Jr. and Robin Miller, and that 22 caliber bullets were used during the shootings of these individuals. (N.T. 3/14/80, 5284–85, 5308–09). All these comments were supported by the evidence and were not improper. Any objection to these comments by defense counsel would have been meritless. *See Bolender,* 16 F.3d at 1573; *Thomas,* 951 F.2d at 904.

Finally, petitioner complains that the prosecutor implied that petitioner was more guilty than Commonwealth accomplice witnesses. (N.T. 3/14/80, 5256–57). It was not improper for the Commonwealth to explain that it viewed the petitioner more responsible for the murders than accomplices who had assisted in the commission of the crimes. Furthermore, it was reasonable for the prosecutor to explain why it was necessary to offer a plea bargain to a lesser participant in order to convict the principals.

For all the above reasons, petitioner's counsel was not ineffective for failing to object to the closing remarks of the district attorney. Moreover, petitioner has not shown that the outcome of his trial would have been different had his counsel objected to the prosecutor's closing remarks or that his right to due process was denied.

### *RECOMMENDATION*

Having carefully considered each of the habeas grounds raised by petitioner, the court concludes that none of the claims warrant habeas relief. Therefore, the court respectfully recommends that the Petition for Writ of Habeas Corpus be denied without an evidentiary hearing. However, because the one issue raised by petitioner—when knowledge of *Brady* material can be imputed to a state prosecutor—is a question "debatable among jurists of reason" which has not been squarely addressed by the Supreme Court or Third Circuit Court of Appeals, the court further recommends that the court certify

that there is probable cause for an appeal pursuant to 28 U.S.C. § 2253. *See Barefoot v. Estelle,* 463 U.S. 880, 893 n. 4, 103 S.Ct. 3383, 3395 n. 4, 77 L.Ed.2d 1090 (1983). This same issue was certified for an appeal by Judge Huyett in the case of *Johnston v. Price,* 1995 WL 447606 (E.D.Pa. July 26, 1995) and is presently before the Third Circuit Court of Appeals.